In re SOUTH VILLAGE, INC., Debtor.

GENERAL ELECTRIC MORTGAGE CORPORATION, previously known as Amfac Mortgage Corporation, an Oregon corporation, Plaintiff,

v.

SOUTH VILLAGE, INC., a Utah corporation, Defendant.

Bankruptcy No. 82–00040.
Civ. No. 82P–0200.

United States Bankruptcy Court,
D. Utah.

Dec. 30, 1982.

Irving Sulmeyer, John P. Eleazarian, Eldon L. Pesterfield, of Sulmeyer, Kupetz, Baumann & Rothman, Los Angeles, Cal., and Robert M. Anderson, Gregory K. Orme, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for General Elec. Mortgage Corp.

William T. Thurman, Stephen W. Rupp, of McKay, Burton, Thurman & Condie, and Duane Smith, of Sessions, Moore & Smith, Salt Lake City, Utah, for debtor.

## MEMORANDUM OPINION ON OPPORTUNITY COST AND ADEQUATE PROTECTION

RALPH R. MABEY, Bankruptcy Judge.

### INTRODUCTION AND BACKGROUND

South Village, Inc. (debtor), the owner of a shopping mall, filed a petition under Chapter 11 on January 11, 1982. General Electric Mortgage Corporation (GEMC), a lienor on the mall, filed a complaint for relief from the stay on March 2. A preliminary evidentiary hearing was held March 24. The evidence showed that, as of March 24, the debt had matured and was due in the amount of $4,369,000. The value of the mall was $4,340,000. Hence, GEMC was undersecured. Before maturity, the debt bore interest at the rate of 14 percent per annum. After maturity, it bears interest at the rate of 17 percent per annum. Interest accrues at $1,633 per day or $596,110 per year. The mall is not appreciating in value sufficient to cover interest. GEMC maintains that, if allowed to foreclose and sell the mall, it could reinvest the proceeds and earn and be paid this interest and more. This is described as the "use value of its money." The suspension of this "value" is said to be the "opportunity cost" imposed by the stay. The question is whether GEMC must be recompensed for this "cost" in order to be adequately protected.[1]

---

1. GEMC describes this as "compensation for the loss of use of its money," compensation for "the delay in foreclosure," the "time value of money lost," the "economic equivalent of the benefit of its bargain," and " 'the value which a secured creditor would realize if he had in his hands today an amount equal to the value of the collateral and was able to reinvest this

## OPPORTUNITY COST AND ADEQUATE PROTECTION

Upon commencement of a case, the stay, found at 11 U.S.C. Section 362(a), bars foreclosure against property of the estate. Relief from the stay, provided in 11 U.S.C. Section 362(d)(1), may be had "for cause." One cause is "the lack of adequate protection of an interest in property." Adequate protection, illustrated in 11 U.S.C. Section 361, is protection of an "interest in property" from any decrease in "value" attributable to the stay. *In re Alyucan Interstate Corp.*, 12 B.R. 803, 806–809 (Bkrtcy., D.Utah 1981).

The measure of any decrease, however, depends upon what is meant by the "value" of an "interest in property." If the interest in property is determined according to the worth of tangible assets, such as the "allowed secured claim,"[2] then the decrease in value may be any depreciation of this claim. But if the interest in property embraces not only tangible assets but also intangible rights, such as the right to foreclose, liquidate, and reinvest, then the decrease in value may include opportunity cost.

In *Alyucan* this court questioned an emphasis upon "contractual rights" rather

---

amount in a way which would produce a return on his investment,' " quoting from *In the Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635, 643 (Bkrtcy.E.D.N.Y.1980). GEMC demands "periodic cash payments equal to the market rate of interest on the amount of [its] secured claim."

A few commentators and cases have treated the problem of opportunity cost and adequate protection. *See, e.g.,* Fortang and King, "The 1978 Bankruptcy Code: Some Wrong Policy Decisions," 56 N.Y.U.L.Rev. 1178, 1163 n. 63 (1981); Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal.L.Rev. 1483, 1506 (1975); Webster, "Collateral Control Decisions in Chapter Cases: Clear Rules v. Judicial Discretion," 51 Am. Bank.L.J. 197, 235–236 (1977); Note, "Automatic Stay Under the 1978 Bankruptcy Code: An Equitable Roadblock to Secured Creditor Relief," 17 San Diego L.Rev. 1113, 1132 (1980); Comment, "The Secured Creditor's Right to Full Liquidation Value in Corporate Reorganization," 42 U.Chi.L.Rev. 510, 517 and n. 44 (1975); *In re Monroe Park,* 17 B.R. 934, 940 (D.Del.1982); *In re Virginia Foundry Co., Inc.,* 9 B.R. 493, 497–499 (W.D.Va.1981); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 826–828 (Bkrtcy.S.D.N.Y.1982); *In re American Mariner Industries, Inc.,* 10 B.R. 711, 712–713 (Bkrtcy.C.D.Cal.1981); *In the Matter of Anchorage Boat Sales, Inc., supra* at 643.

2. "Allowed secured claim" is defined at 11 U.S.C. Section 506(a). If the creditor has a lien against property, and if he is oversecured, the allowed secured claim is the amount of the debt. If he is undersecured, it is the value of the collateral. Hence, the statute contemplates the division of claims into secured and unsecured parts, with reference to the worth of the property. As explained in the House Report: "One of the more significant changes from current law in proposed Title 11 is the treatment of secured creditors and secured claims. Unlike current law, H.R. 8200 distinguishes between secured and unsecured claims, rather than between secured and unsecured creditors. The distinction becomes important in the handling of creditors with a lien on property that is worth less than the amount of their claim, that is, those creditors that are undersecured. Current law is ambiguous and vague, especially under Chapter XIII, on whether an undersecured creditor is to be treated as a secured creditor, or as a partially secured and partially unsecured creditor. By addressing the problem in terms of claims, the bill makes clear that an undersecured creditor is to be treated as having a secured claim to the extent of the value of the collateral and an unsecured claim for the balance of his claim against the debtor. The new treatment of secured claims, especially the bifurcation of the claims into secured and unsecured claims, has important protective consequences for both creditors and the debtor. For the creditor, the bill requires that once the secured claim is determined, the court must insure that the holder of the claim is adequately protected. The secured creditor is entitled to realize his claim, and not have his collateral eroded by delay or by use by the estate. For the debtor, the determination of the amount of the secured claim facilitates reorganization in the business context, and repayment plans in the consumer context, by defining the precise extent of the claims against the debtor that must be treated specially as secured claims." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 180–181 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6141. In other words, Section 506(a) "separates an undersecured creditor's claim into two parts—he has a secured claim to the extent of the value of his collateral, he has an unsecured claim for the balance of his claim... [T]hroughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim." *Id.* at 356, U.S.Code Cong. & Admin.News, p. 6312.

than "economic values" in construing adequate protection. *In re Alyucan Interstate Corp., supra* at 808 n. 11.[3] But this distinction may be thin where "rights" and "values" are closely intertwined. Indeed, when speaking of opportunity cost, the "value" of the "interest in property" may be inseparable from the "right" to foreclose, liquidate, and reinvest. Thus, the legislative mandate that, even where "the creditor might not receive his bargain in kind," he must receive "in value essentially what he bargained for," H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin.News, p. 6295, may require the "value" of the "interest in property" to be gauged in light of what the holder could have realized through enforcement of the contract.

Nevertheless, this "economic equivalent of the benefit of the bargain" may not be easily reconciled with the language and legislative history of Section 361, or with other provisions of the Code.

**3.** This tension between "contractual rights" and "economic values" was highlighted by lessors, testifying before Congress, who critiqued the concept of adequate protection as expressed in Section 361. They argued that "protection against diminution of property value alone, while potentially adequate for the lender-lien holder, is far from adequate for the lessor who has given the lessee the economic benefit of tax incentives. Mere use of the equipment in violation of lease provisions which does not decrease the value of such entity's interest in such property may involuntarily impose significant financial hardships upon a lessor in the form of lost tax incentives and other damages." Pending a decision by the trustee to assume or reject a lease, "the lessor's interests will often extend far beyond preserving the market value of the leased asset. Moreover, neither periodic cash payments ... nor an additional or replacement lien ... may suffice to protect the full range of a lessor's interests in some cases." *Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 804 and 1214 (1977). They suggested "that the language or legislative history of § 361 should make it clear that, for commercial lease transactions, the phrase 'the value of such entity's interest in such property' in § 361 should be interpreted to mean the full economic value of the overall transaction." In short, Section 361 "should be clarified to provide that 'adequate protection' in the case of a commercial lease

## OPPORTUNITY COST AND SECTION 361

■ 1. *The Language of Section 361.* Section 361 provides three nonexclusive illustrations of adequate protection. Adequate protection, according to the first two examples, may be supplied through "periodic cash payments" or "additional or replacement liens" to the extent that "the stay ... results in a decrease in the value of [the] interest in property." This language probably refers to depreciation of the allowed secured claim, not opportunity cost.

Adequate protection may take the form not only of cash payments, which might reduce the opportunity cost, but also of replacement liens, which might not. If adequate protection includes opportunity cost, it might have been defined, not illustrated, as cash payments. The argument for opportunity cost loses force in light of the alternate means of adequate protection.[4]

2. *The Legislative History of Section 361.*

means performance of all obligations of the debtor under the lease contract." *Hearings on S. 2266 and H.R. 8200, supra* at 1214 and 1215.

These criticisms are instructive for at least two reasons. First, Section 361 was not changed or "clarified" to account for the argument that adequate protection should be keyed to rights under a contract rather than to values in property, suggesting a rejection of this approach to adequate protection. Second, the adequate protection afforded lessors in reorganization differs from the demands which they made in Congress. At most, lessors receive payments for depreciation or occupancy, payments which are tied to the value or use value of property, not to intangible contractual prerogatives. *See, e.g.,* 2 Collier on Bankruptcy ¶ 365.03[2], at 365–24—365–26 (15th ed. 1981); Fogel, "Executory Contracts and Unexpired Leases in the Bankruptcy Code," 65 Minn.L. Rev. 341, 372–376 (1980). *Cf. In re Booth,* 19 B.R. 53, 61 n. 18 (Bkrtcy.D.Utah 1982).

**4.** "[A]nother form of adequate protection might be the guarantee by a third party outside the judicial process of compensation for any loss incurred in the case." H.R.Rep. No. 95–595, *supra* at 340, U.S.Code Cong. & Admin.News, p. 6296. And "adequate protection may be offered by indirect means such as by requiring the trustee to make payments to superior lienholders or to pay taxes or the expenses of operation of the encumbered property." 2 Collier on Bankruptcy ¶ 361.01[4], at 361–12 (15th

ed. 1981). In any case, "time is a key element that is sought by debtors. When a debtor seeks more time on the sole ground that the economy may change for the better, adequate protection may necessitate periodic payments to a creditor to compensate for its eroding lien position if the value of the lien is being impaired. Alternatively, where a debtor seeks more time to effectuate improvements to the collateral, to prosecute a case to obtain a reduction in the assessed value of real property for tax purposes, or to negotiate a specific lease or beneficial contract, those very acts may go a long way toward satisfying the adequate protection requirement without necessitating cash payments." H. Miller, Adequate Protection in Respect of the Use, Sale or Lease of Property 3 (New York University Law School Workshop 1982).

Cases requiring opportunity cost as adequate protection have attached considerable weight to Section 361(3). This statute permits a debtor in possession or trustee to grant "such other relief ... as will result in the realization by [the creditor] of the indubitable equivalent of [his] interest in ... property." The "indubitable equivalent" standard was derived from *In re Murel Holding Corporation,* 75 F.2d 941 (2d Cir.1935). In *Murel,* the debtors owned an apartment house with an assessed valuation of $540,000. The first mortgagee, which held a note for $400,500 with arrearages of $79,000, had commenced foreclosure in state court, and debtors filed a petition under Section 77B, the precursor to Chapter X of the Chandler Act of 1938, and obtained an *ex parte* stay of the state court proceedings. Debtors filed a plan with the petition which provided that interest but no principal would be paid to the mortagee for 10 years. Thereafter, normal amortization of the loan would resume. The mortgagee rejected this proposal which meant that the plan, to be confirmed, had to satisfy one of four alternate standards under former 11 U.S.C. Section 207(b)(5). The debtor elected to proceed under Section (b)(5)(d) which required the plan to "provide adequate protection for the realization by [the creditor] of the full value of [his] interest, claims, or liens." The *Murel* opinion noted that, "properly speaking," this was not "a 'method' at all; it merely gives power generally to the judge 'equitably and fairly' to 'provide such protection,' that is, 'adequate protection,' when the other methods are not chosen. It is this alone which the debtors invoke. In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the proper-

ty. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence." *Id.* at 942.

However, Section 361(3), as adumbrated in *Murel,* may be unhelpful in construing adequate protection for at least three reasons.

First, while *Murel* involved relief from a stay, the court analyzed confirmation standards under Section 207(b)(5). This approach, reflecting a coincidence of short and long term remedies for secured creditors in the Act, may be unreliable under the Code. Adequate protection, after all, "is interim protection, designed not as a purgative of all creditor ailments, but as a palliative of the worst: reorganization, dismissal, or liquidation will provide the final relief." *In re Alyucan Interstate Corp., supra* at 806. Indeed, there may be a fundamental divergence between adequate protection and confirmation standards under the Code. *See, e.g., Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st Sess., Ser. 27, pt. 1, at 498–499 (1975). This possibility, however, need not be explored at present.

Second, the focus on Section 361(3), to the exclusion of other possibilities, "violate[s] the nonprescriptive character of Section 361, and may simply exchange one imponderable for another. Indubitable equivalence is not a method; nor does it have substantive content. Indeed, something 'indubitable' is more than 'adequate;' 'equivalent' is more than 'protection;' hence, the illustration may eclipse the concept. At best, it is a semantic substitute for adequate protection, and one with dubious, not indubitable, application to the question of relief from the stay." *In re Alyucan Interstate Corp., supra* at 809.

Third, in the final analysis, aside from coining a delphic phrase, *Murel* adds little to our understanding of adequate protection. Postponing payment of principal for 10 years may not supply adequate protection. But *Murel* does not even stand for this much. The opinion emphasizes the slim margin of security, the inability of the debtor to pay its way for years: "The amount [contributed to capital by junior interests] is a mere trifle compared with the debts; its effect is wholly speculative, based upon expectations of those who have everything to gain and nothing to lose... It does not seem to us that this setting authorized any stay; it should appear that the plan proposed has better hope of success; full details may not be necessary, but there must be some reasonable assurance that a suitable substitute will be offered. No doubt less will be required to hold up the suit for a short time until the debtor shall have a chance to prepare; much depends upon how long he has had already, and upon how much more he demands." *In re Murel Holding Corporation, supra* at 942–943. In

Proponents of opportunity cost see "value," as that term is used in Section 361, as cash value. This follows from their emphasis on contractual rights—as distinct from tangible assets—including the rights of foreclosure, liquidation, and reinvestment. This value is fixed by a market for the use of money, without regard to the allowed secured claim. Value as cash value, however, may not square with the legislative history of Section 361.

The Commission proposal described "adequate protection," not as protection of the value of money, but as protection "to the extent of the anticipated decrease in the value of the collateral as a result of use." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, pt. II, at 237 (1973). The Commission proposal was "essentially a codification of such cases as . . . *In re Bermec,* 445 F.2d 367 (2d Cir.1971)." Report of the Commission on the Bankruptcy Laws of the United States, *supra* at 236. *Bermec* permitted a debtor to use collateral subject to the payment of "the 'economic depreciation' on the secured creditors' equipment so as approximately to preserve [the] status quo." *In re Bermec, supra* at 239. Jack Gross, the attorney who represented the creditors in *Bermec,* explained the phrase, "economic depreciation," by stating that the court had "set a hearing and detailed evidence was adduced with respect to the rates of depreciation of the hard security . . . and . . . the trustee was directed to make monthly payments equal to the rate of depreciation." *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess., Ser. 27, pt. 3, at 1763 (1976).[5]

---

short, in *Murel,* a stay was not justified, but this result was fact-specific, not a categorical imperative.

5. Bills modeled on the Commission proposal were introduced in the 94th Congress. *See,* H.R. 31 and S. 236, 94th Cong., 1st Sess. (1975). The National Conference of Bankruptcy Judges, which had established a panel to review the Commission proposal, introduced similar bills in the same Congress. *See,* H.R. 32 and S. 235, 94th Cong., 1st Sess. (1975). Witnesses who testified at hearings on these measures assumed that adequate protection, as used in Section 7–203, meant protection for the depreciation of collateral, not the value of money.

For example, Walter Vaughan, Chairman of the American Bankers Association, accompanied by his counsel, Patrick A. Murphy, had this colloquy with Senator Burdick:

Mr. Vaughan. We are recommending that the value of the secured creditor's claim against the collateral will definitely be preserved. That is our primary concern.

Senator Burdick. Suppose it is a farmer, and. he has a tractor for $500, a secured mortgage—whatever you want to call it, for $1,000. It is worth $500. Right now, the value can be challenged. Is that adequate protection?

Mr. Vaughan. In the determination of the value, we certainly want to be assured that the evaluation of that collateral is appropriate.

Senator Burdick. What more assurance could you give than the right of appeal, for example, to the courts if necessary? How else could you make safeguards?

Mr. Murphy. Mr. Chairman, I think the crucial point in your hypothetical of the farmer with the $500 tractor and the $1,000 debt against it is one of who would have the burden of demonstrating the value, and, as we understand existing law, the burden is usually on the party seeking the continuation of the stay. The farmer would be obligated to come forward and demonstrate, first the value, and second—this is the crucial part of it—how that value would be maintained during the period of the stay. We can appreciate that, even where there may not be an equity in the farmer's tractor, the tractor may be needed to complete that year's harvest, which in turn may produce adequate proceeds for the benefit of all creditors. What we are saying, by supporting the proposition of expanded jurisdiction with an appropriate provision for the maintenance of values in your hypothetical, is that we would expect a determination of the amount of depreciation that tractor would suffer during that crop year, and would be prepared to see the farmer keep the tractor as long as the amount of depreciation is reimbursed. This is the theme that we believe runs throughout both of these bills; the idea of maintaining the secured creditor's position, but of not necessarily permitting the secured creditor to pick up the collateral simply because there may not be an equity. We recognize that there may be situations where there is no equity, but the collateral may be so crucial to the whole business or to the debtor that it is necessary to continue to use the collateral for rehabilitation.

The idea of adequate protection was taken from the Commission proposal and codified in subsequent drafts of the Reform Act. *See,* Section 361 of H.R. 8200, 95th Cong., 1st Sess. (1977); Section 361 of S. 2266, 95th Cong., 2d Sess. (1978). The legislative history of these bills, like the Commission Report, did not discuss the value of money; it emphasized "the decrease in value of the property involved," H.R.Rep. No. 95–595, *supra* at 339, U.S.Code Cong. & Admin.News, p. 6296, "any decrease in the value of such party's collateral," 124 Cong. Rec. H11,092 (daily ed., September 28, 1978), and "a means of realizing the value of the original property, if it should decline during the case." H.R.Rep. No. 95–595, *supra* at 339–340, U.S.Code Cong. & Admin. News, p. 6296.[6] The Senate Report, like the Commission Report, noted the derivation of adequate protection, in part, from *Bermec,* and observed that "[t]he use of periodic

Senator Burdick. You are saying the value should be maintained at the time they file? Mr. Murphy. At the time of filing, and throughout the proceeding, there should be the concept of interim payments, which may or may not be in the amount of schedule payments. If it is found that the tractor will depreciate by $200 during that crop year, then in some sort of periodic payments the creditor should be paid $200 during that crop year. *Hearings on S. 235 and S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 94th Cong., 1st Sess., pt. I, at 133–134 (1975).

Comments submitted by the National Commercial Finance Conference emphasized that "[o]bviously, any use must have an adverse effect on the rights of the secured creditor or lessor, in varying degrees depending on the type of property involved. In the case of machinery and equipment, wear and tear, depreciation and gradual diminishment in value will occur, for which the secured creditor or lessor should be compensated." It suggested an amendment providing for "[p]eriodic payment to the secured creditor or lessor of amounts sufficient to cover deterioration, consumption, depletion or depreciation resulting from use." *Hearings on S. 235 and S. 236, supra* pt. II, at 509 and 508. *See also,* statement of Robert J. Grimmig, Vice President, Chemical Bank, New York, on behalf of the American Bankers Association, accompanied by Patrick A. Murphy, representing Bank of America National Trust and Savings Association, *Hearings on S. 235 and S. 236, supra* pt. II, at 475 ("Mr. Justice Douglas said [in *Wright v. Union Central Life Insurance Company,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184], and I think we would agree, that the right of the secured creditor is to have the value of his collateral maintained throughout the proceeding"); statement of Eli S. Silberfeld, general counsel for National Commercial Finance Conference, accompanied by Carroll G. Moore, Chairman of Committee on Legislation of the National Commercial Finance Conference, *Hearings on S. 235 and S. 236, supra* pt. II, at 522 ("The order, in most cases . . . . should make provision for compensation to the secured party for the use of property. Such

compensation would be in the form of periodic payments, which would approximate what would be necessary to cover depreciation of the property or wear and tear. I think that this would be a relatively simple provision in the case of machinery and equipment where the exposure to the creditor could be fairly well determined in advance and where the risk to the creditor is, I would say, not that serious, for static assets are involved"); statement of John J. Creedon, Chairman of the Subcommittee on Federal Bankruptcy Legislation of the American Life Insurance Association, *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess., Ser. 27, pt. 3, at 1608 (1976) ("The creditor or landlord should be compensated for the use . . . . in an amount equal to the economic decline in value of the property").

6. Congress's linkage of adequate protection with the value of collateral may have been based, in part, upon the economic function of secured financing. Certain fledgling enterprises cannot obtain an unsecured loan at any price. Credit is available, if at all, only on a secured basis. According to witnesses in hearings on the Reform Act, the commercial finance companies, such as General Electric Credit Corporation, Aetna Business Credit, and Commercial Credit meet the needs of these borrowers, and while charging a higher rate of interest, make their loans "regarding one basic criterion, and that is the value of the collateral they are receiving. They are experts in evaluating collateral. If they were not experts, they would very soon be out of business. That is the whole trick of commercial finance: to be able to rely on your collateral." *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st Sess., Ser. 27, pt. 1, at 506 (1975). Congress may have believed that, since lenders look to the value of collateral as a safety net, it would not be inappropriate to tie Section 361, at least as an interim remedy, pending confirmation of a plan, or dismissal of the case, to the same measure of protection.

payments may be appropriate where, for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be to compensate for the depreciation and might, but need not necessarily, be in the same amount as payments due on the secured obligation." Sen. Rep. No. 95–989, 95th Cong., 2d Sess. 54 (1978), U.S.Code Cong. & Admin.News, p. 5840.[7] And after differences between the House and Senate bills were resolved, floor leaders concluded that "[a]dequate protec-

7. Payments on a security agreement have an interest as well as a depreciation component. If payments under Section 361(1) cover depreciation, but need not match the agreement, as suggested in the Senate Report, then contractual interest may not be required for adequate protection. If contractual interest is not required, then opportunity cost, *a fortiori,* may be unnecessary.

8. Aside from these explanations of the meaning of adequate protection, certain negative inferences may be drawn from the legislative record. For example, one critic of the Commission proposal testified that adequate protection should mean cash payments to the secured creditor which would result in "interest or compensation for its cost of funds." Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal.L.Rev. 1783, 1506 (1975), entered in the record at *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess., Ser. 27, pt. 3, at 1799 (1976). He conceded that "[t]his idea may seem shocking at first because it has been long recognized in bankruptcy that a secured creditor is entitled to the payment of interest only in the event that it holds surplus security above the amount necessary to cover principal. If there is extra security, the rights of the secured creditor are not being jeopardized and interim payments are unnecessary." *Id.* "Nevertheless," he explained, "the secured creditor in effect receives interest under the present Bankruptcy Act when the debtor in a Chapter XI proceeding just continues to pay his secured obligations substantially according to their terms or works out an alternative payment schedule. If the stay of the marginally secured creditor is properly viewed as an involuntary loan of property to the debtor, there seems little reason not to afford the secured creditor some protection against the ravages of inflation and the fact that his own creditors have not given him an interest moratorium." *Id.*

These ideas, of course, were not new to Congress. Some commentators had argued that

tion of an interest of an entity is intended to protect a creditor's *allowed secured claim.*" 124 Cong.Rec. H11,092 (daily ed., September 28, 1978); 124 Cong.Rec. S17,409 (daily ed., October 6, 1978). (Emphasis supplied.) [8]

The authors of the Code thus explained that adequate protection was protection, not of the value of money, nor of any equity cushion,[9] but against depreciation of the collateral when it erodes the allowed secured claim.[10]

the use value of money was a matter of constitutional right. *See, e.g.,* Comment, "The Secured Creditor's Right to Full Liquidation Value in Corporate Reorganization," 42 U.Chi.L.Rev. 510, 517 and n. 44 (1975). Others had labeled this a "dubious proposition." Webster, "Collateral Control Decisions in Chapter Cases: Clear Rules v. Judicial Discretion," 51 Am. Bank.L.J. 197, 235–236 (1977). Cases under the Act had given relief to creditors because of opportunity cost. *Cf. In the Matter of Penn Central Transportation Company,* 474 F.2d 832, 837 (3d Cir.1973); *In the Matter of Holiday Lodge, Inc.,* 300 F.2d 516, 520 (7th Cir.1962); *In re Sixth Avenue Investment and Development Company,* 2 B.C.D. 1222, 1228 (S.D.Cal.1976); *In the Matter of Gelormino Construction Company,* 2 B.C.D. 39, 40–41 (W.D.Pa.1975). *But cf. In the Matter of Investors Funding Corporation of New York,* 592 F.2d 134, 137 (2d Cir. 1979); *In re Castle Village Company,* 3 B.C.D. 588 (S.D.N.Y.1977).

Congress, in light of this background, was aware of the prejudice caused by delay in the enforcement of rights and the time value of money. Given this awareness, and solutions to the problem found elsewhere in the Code, *see, supra* at 10–13, the omission of opportunity cost from Section 361 may be significant. Indeed, if adequate protection includes opportunity cost, this might have been reflected by changing "value" to "present value," or some similar modification of Section 361.

9. Because GEMC is undersecured, there is no equity cushion in this case. Nevertheless, so long as there is no decrease in the allowed secured claim, that claim is adequately protected. *In re Alyucan Interstate Corp., supra* at 809–813.

10. Since GEMC is undersecured, the court need not determine whether post-petition interest would be allowed under 11 U.S.C. Section 506(b), and if so, whether that increment to the allowed secured claim must be adequately protected. *See, e.g.,* O'Toole, "Adequate Protection and Postpetition Interest in Chapter 11 Proceedings," 56 AM.BANK.L.J. 251 (1982).

Another part of the legislative record, dealing with the debate over "value," supports this interpretation, and equates the "interest in property," not with any contractual benefit, such as the right to foreclose, liquidate, and recoup opportunity cost, but with the allowed secured claim.

The Commission proposal noted that "[a] benchmark in determining the adequacy of protection is the liquidation value of the collateral at the date of the petition." Report of the Commission on the Bankruptcy Laws of the United States, *supra* at 237. Creditors objected to this proposal, arguing that since their collateral was being commandeered to further rehabilitation, it should be assigned a going concern value. *See, e.g., Hearings on S. 235 and S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 94th Cong., 1st Sess., pt. II, at 652 (1975); *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st Sess., Ser. 27, pt. 1, at 495, 1607, and 1754 (1975). Moreover, given the elusiveness of values and the uncertainties of reorganization, they insisted that a valuation at one stage of the proceeding for one purpose should not be binding upon parties throughout the proceeding and for all purposes. *See, e.g.,* Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 256 (1978).

As a result of this debate, Congress left the method and timing of valuation open-ended. They are to be accomplished according to the "equitable considerations" of each case.[11] This debate over value, however, has at least three implications for the problem of opportunity cost and adequate protection.

First, the preoccupation with going concern and liquidation values makes sense if one is discussing assets in specific or the enterprise as a whole, but not the value of money.

Second, the treatment of collateral at going concern values, argued for (and received where the equities dictate) by creditors because it affords a higher starting point from which to measure any decrease in value and hence any need for adequate protection, is at odds with opportunity cost which posits a liquidation of the property and reinvestment of the proceeds. Under these circumstances, one cannot consistently ask for going concern valuations *and* opportunity cost as adequate protection.[12]

The question of oversecured claims, postpetition interest, and adequate protection has never been answered in this district. *In re Alyucan Interstate Corp., supra,* in its statement of facts, assumed that where a creditor was oversecured, interest might accrue, but the opinion reserved judgment on this score, *id.* at 808 n. 10, and indeed, its approach, which eschews an equity cushion analysis, is indifferent to the problem: whether or not interest enlarges the allowed secured claim, it is that claim, not an equity cushion, which measures the value of the interest in property which is to be adequately protected. In *Alyucan,* that claim, however measured, with or without interest, was not decreasing in value. Hence, the creditor was adequately protected. Notwithstanding these facts, O'Toole chides *Alyucan* for going only "halfway" and "failing to discover the restraints section 506 places on the allowance of postpetition interest." O'Toole, *supra* at 271-272.

11. *See,* H.R.Rep. No. 95–595, *supra* at 339. *See also, id.* at 356; Sen.Rep. No. 95–989, *supra* at 68; 124 Cong.Rec. H11,095 (daily ed., September 28, 1978).

12. Section 506(a) defines "allowed secured claim," and hence, the "value" of an "interest in property" according to "the purpose of the valuation and of the proposed disposition or use of such property." *See, supra,* note 2, at 15. If value is determined, in part, by the use of property in a case, and if this use is for reorganization, it may be incongruous to speak of contractual liquidations. It is not the contract but the use which fixes the value, and reorganization means not only liquidation but also rehabilitation. Indeed, lenders, sensing this incongruity, criticized the Commission which set liquidation value as the benchmark for adequate protection. They complained that this "would deprive the secured creditor of an increase in value" during the course of a case, for example, upon "the conversion of materials in process to a finished product." *Hearings on S. 235 and S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 94th Cong. 1st Sess., pt. II, at 510 (1975). *Cf.* Epling, "Cramdown Under the Bankruptcy Code of 1978: Effect Upon the Soft Collateral Lender," 12 Loy. U.L.Rev. 627, 641 (1981).

Third, the mutability of values means that collateral may have a liquidation value at a relief from stay hearing, leaving a creditor undersecured, and a going concern value at a confirmation hearing, leaving a creditor oversecured. If being undersecured is the predicate for opportunity cost, this predicate is inconstant. Opportunity cost, therefore, will be based upon a value which, because it is for a discrete purpose and a single hearing, may be irrelevant to other purposes and subsequent hearings.[13] In short, the basis for opportunity cost, tied as it is to the method and outcome of valuation, may be either incalculable or evanescent.[14]

Thus, the legislative history of value, as that term is used in Section 361, opposes the argument for opportunity cost as adequate protection; Congress did not intend Section 361 to require the payment of opportunity cost as adequate protection.[15]

13. The mutability of values, likewise, is one more reason for rejecting the equity cushion as a means of adequate protection. *In re Pitts,* 2 B.R. 476 (Bkrtcy.C.D.Cal.1979) and other cases, emphasizing the imprecision of appraisals, have used the cushion as their margin for error in the valuation of property. This approach, however, is unsound for at least three reasons. First, it overlooks the relativization of values in the Code, *i.e.,* values change from purpose to purpose and from hearing to hearing; the debtor may have no equity in a seedling crop when a petition is filed, but he may have equity in a bumper harvest when a plan is proposed. Second, it assumes that the court will err by always undervaluing and never overvaluing property. This assumption may be questionable, especially in light of the creditors' argument for higher valuations in order to obtain more adequate protection. *See, supra* at 5–7. Moreover, it places the risk of error in valuations entirely upon the debtor, whereas the legislative history suggests that this risk should be allocated according to the "equitable considerations" of each case. *See, supra* note 11, at 20. Third, it overrides the legislative judgment to establish a superpriority, and not a cushion, as the remedy for errors in valuation. *In re Callister,* 15 B.R. 521 (Bkrtcy.D.Utah 1981).

14. Opportunity cost as adequate protection may be difficult to reconcile with the timing as well as the method of valuation. Creditors, as a rule, insist that value be determined as of the petition, because they want protection early in the case while values are high and before they slide. *See, e.g., Hearings on S. 235 and S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 94th Cong., 1st Sess., pt. II, at 474 (1975); *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess., Ser. 27, pt. 3, at 1754 (1976). The date of the petition, however, may be irrelevant to opportunity cost which would accrue only from the date upon which the creditor—absent the stay—could first liquidate the collateral whenever that might be. *But see, id.* at 1813 (The commission proposal should have "faced reality" by providing for the valuation of property on "the date when the question of use is actually before the court rather than the date of the petition").

15. GEMC also argues that it is entitled to opportunity cost as a matter of constitutional right, relying upon *Louisville Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). The idea of adequate protection, in part, is "derived from the fifth amendment protection of property interests" as articulated in *Radford.* H.R.Rep. No. 95–595, *supra* at 339, U.S.Code Cong. & Admin.News, p. 6295. The standing of *Radford* as precedent, however, is unsettled. *See, e.g., United States v. Security Industrial Bank,* —— U.S. ——, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) (majority and concurring opinions). Moreover, *Radford* shows that opportunity cost is not required by the fifth amendment.

In *Radford,* a farmer had invoked the protections of the Frazier-Lemke Act of 1934, which provided a moratorium on payments to mortgagees. The farmer had two options. Under paragraph (3) of Section 75(s) of the Act, and with the consent of the mortgagee, he could buy the property at an appraised value by making payments over time with interest at one percent per annum. Under paragraph (7) of Section 75(s), and without the consent of the mortgagee, he could stay foreclosure for 5 years, and buy the property at an appraised value at any time during this interim. The farmer remained in possession of the property, provided that he paid an annual rent. The court held that Section 75(s)(7) invaded several substantive property rights of the mortgagee, and therefore ran afoul of the fifth amendment.

GEMC points to the provision for rent, argues that this is tantamount to opportunity cost, and insists that as such it is required by the fifth amendment as applied in *Radford.* This argument is misguided for several reasons.

First, the provision for rent is not the same as opportunity cost. Rent measures the use value of property; opportunity cost is the use value of money. The facts in *Radford* demonstrate this difference. Rent was $325 per year. *Louisville Bank v. Radford, supra* 295 U.S. at 577, 55 S.Ct. at 857. The bank held a judgment

## OPPORTUNITY COST MAY BE INCONSISTENT WITH OTHER PROVISIONS OF THE CODE

Opportunity cost, if required as an element of adequate protection, may be incongruent with the Code, especially 11 U.S.C. Sections 502(b)(2), 506(b), 1124(2), and 1111(b).

1. *Opportunity Cost and Sections 502(b)(2) and 506(b).* The Code, following prior law, suspends the accrual of interest on claims, secured and unsecured, once a petition is filed. *See,* 11 U.S.C. Section 502(b)(2). This rule is founded in fairness. Since delay in payment is an act of the law, it should work no inequality. The onus of delay, as reflected in the time value of money, is borne ratably by all parties. *See, e.g.,* 3 Collier on Bankruptcy ¶ 502.02[2] (15th ed. 1981).

Prior law recognized several exceptions to this rule. One of these is acknowledged in the Code. *See,* 11 U.S.C. Section 506(b). It provides for the allowance but not the payment of interest where a creditor is oversecured and where his contract permits. *See, e.g.,* 3 Collier on Bankruptcy, *supra* ¶ 506.05.[16]

Opportunity cost, however, contemplates that interest will not only accrue [17] but also be paid, even when the creditor is undersecured,[18] and at a market not a contract rate.[19] It therefore may run afoul of both the rule and the exception.[20]

for $9,205 with interest at six percent per annum, *id.* at 591 n. 20, 55 S.Ct. at 864 n. 20, or $552.30. The use value of money is discussed in connection with paragraph (3) not paragraph (7) of Section 75(s), and the court points to the legal not the market rate of interest. *Id.* This was the same as the contract rate of interest. Id. at 573, 55 S.Ct. at 855.

Second, rent was required by the statute as a matter of legislative choice, not by the court as a matter of constitutional principle. Indeed, since *Radford* invalidated Section 75(s)(7), it is difficult to determine which features of the statute may have been approved, rather than disapproved, on constitutional grounds.

Third, the court did not question delay in the enforcement of rights, a fact relevant to opportunity cost. *Louisville Bank v. Radford, supra* at 583, 55 S.Ct. at 860. Later cases construing Section 75(s), as amended and reenacted, upheld a 3 year moratorium on payments to a mortgagee against attack on fifth amendment grounds. *See, e.g., Wright v. Vinton Branch,* 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937). Indeed, in *Wright v. Union Central Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), the lower courts had dismissed a petition under Section 75(s)(3) because, among other reasons, the debtor had paid no principal for 13 years and no interest for 8 years on his mortgage, but the Supreme Court reversed, holding that dismissal was improper without giving the debtor an opportunity to redeem the property at an appraised price. This procedure, according to the Court, was constitutionally valid. *But see,* Comment, "The Secured Creditor's Right to Full Liquidation Value in Corporate Reorganization," 42 U.Chi.L.Rev. 510, 517 and n. 44 (1975).

16. Prior law recognized other exceptions to the rule suspending postpetition interest. For example, income produced from collateral could be applied toward interest. In this case, GEMC holds an assignment of rents from the mall and thus might come within this exception. Section 506(b), however, does not codify this aspect of prior law, and its survival may be questioned under the Code. In any event, it is unclear from the evidence what if any income might be available after satisfaction of operating expenses to service the debt to GEMC. *See generally,* O'Toole, "Adequate Protection and Postpetition Interest in Chapter 11 Proceedings," 56 Am.Bank.L.J. 251 (1982).

17. Section 506(b) may not invariably require the allowance of interest. *See, e.g., Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 164–165, 67 S.Ct. 237, 240–241, 91 L.Ed. 162 (1946).

18. Insofar as GEMC is undersecured, it is unsecured. *See, supra,* note 2, at 15. Unsecured claims do not receive postpetition interest by virtue of Sections 502(b)(2) and 506(b). Moreover, they are not entitled to adequate protection under Section 361. *See, e.g., In re Garland Corp.,* 6 B.R. 456, CCH Bank.L.Rep. ¶ 67,643, at 78,109 and 78,113 (1st Cir., Bkrtcy.App.Pa., 1980); *In re Bindl,* 13 B.R. 148 (Bkrtcy.W.D. Wis.1981); *In re Munsey Corp.,* 10 B.R. 864 (Bkrtcy.E.D.Pa.1981); *In re Fairway Records, Inc.,* 6 B.R. 162, 2 C.B.C.2d 1015 (Bkrtcy.E.D.N. Y.1980). *Cf. Louisville Bank v. Radford,* 295 U.S. 555, 588, 55 S.Ct. 854, 862, 79 L.Ed. 1593 (1935). *But cf. In re Boston and Me. Corp.,* 484 F.2d 369, 374 (1st Cir.1973). This underscores the inappropriateness of paying opportunity cost as adequate protection to an undersecured creditor.

19. The court assumes without deciding that interest accrues at the contract rate under Section 506(b). *But see,* Baylor, "After Bankruptcy Lets the Curtain Fall: Are Claims in Reorganization Proceedings for Post-petition Interest

## 2. Opportunity Cost and Section 1124(2).

■ Section 1124(2) permits the proponent of a plan to cure defaults and reinstate the terms, including the interest rate, of a loan. This leaves the lender "unimpaired," which means he may not dissent from the plan. *In re Barrington Oaks General Partnership,* 15 B.R. 952 (Bkrtcy.D.Utah 1981).

In other words, Section 1124(2) breaks the cycle of default, acceleration, foreclosure, and liquidation upon which the argument for opportunity cost is grounded. Given this option to reinstate the contract on its original terms when a plan is proposed, it may be anomalous to require the payment of interest at a market rate while a case is pending. *Cf. In re Hewitt,* 16 B.R. 973, 980 (Bkrtcy.D.Alaska 1982).[21] If this occured, and if the market rate were greater than the contract rate, a refund of interest from the creditor to the estate would be necessary upon confirmation of a plan. Aside from the administrative inconvenience of such a course, the need to invent a procedure for refunds is proof that Congress never contemplated opportunity cost as adequate protection in light of Section 1124(2).

## 3. Opportunity Cost and Section 1111(b).

Section 1111(b) modifies the definition of allowed secured claim for the protection of undersecured creditors in Chapter 11. It provides that nonrecourse claims will be treated as recourse claims, permitting any undersecured amount, which would otherwise be disallowed, to participate in distributions made to unsecured creditors in a plan, unless as a class, they elect to remain nonrecourse. If this election is made, they are unable to participate with unsecured creditors in a plan, but are deemed secured

---

**20.** Many obligations, like the note in this case, provide for two rates of interest, a normal rate when payments are current, and a penalty rate when they are in default. Penalty rates may be "commercial responses to the time value of money. Lender compensates itself for the time value of the principal amount it lends to Borrower by charging a given interest rate. . . . This initial interest rate takes into account the fact that Lender is entitled to repayment of the principal, with interest, at a certain time. When that time comes, and Borrower defaults, Lender is injured. The initial interest rate was based on the assumption that the principal would in fact be repaid on time. Borrower's default means Lender will be without its principal for an indefinitely longer time than it expected, hence, there is more time value at risk, and Lender may reasonably require correspondingly greater compensation. The period of time during which Lender felt the initial interest rate would be adequate compensation for the time value of the principal was the period beginning with Lender's advance of the principal and ending with the due date of the loan. When the period of time becomes indefinitely longer because of Borrower's default, Lender may legitimately argue that it is entitled to charge additional interest in order to compensate itself for, among other things, its uncertainty about the ultimate recovery of its principal and both the quantifiable and unquantifiable transaction costs incurred by Lender when its expectations of timely repayment are not fulfilled." Baylor, "After Bankruptcy Lets the Curtain Fall: Are Claims in Reorganization Proceedings For Post-petition Interest at Higher 'Default Rates' Consigned to Universal Darkness," 86 Com.L.J. 221, 228–229 (1981). If the penalty rate represents the lender's estimate of risk in the event of default and possible bankruptcy, and if the lender may recover interest at this rate, at least within the parameters of Section 506(b), then the lender may be recompensed, to some extent, for opportunity cost. It may be unfair, under these circumstances, to allow the lender, under the rubric of adequate protection, to second guess its original bargain, and substitute a current market rate for the contractual penalty rate. *Cf. In the Matter of Maryvale Community Hospital, Inc.,* 456 F.2d 410, 413 (9th Cir.1972). No doubt, in this case, if the market rate fell below 17 percent per annum, GEMC would argue that its contractual penalty rate, not a current market rate, affords the "economic equivalent of the benefit of the bargain."

**21.** The court recognizes that, since the loan from GEMC has matured, the claim of GEMC may be impaired, and hence, this analysis of Section 1124(2) may have no bearing upon the question of opportunity cost in this case.

for the amount of the debt, not the value of the property.[22]

Section 1111(b) was designed to overrule *In re Pine Gate Associates,* 2 B.C.D. 1478 (N.D.Ga.1976). In *Pine Gate,* the court exercised its "cram down" powers under Chapter XII, former 11 U.S.C. Section 861(11)(c), to cash out a nonrecourse, undersecured mortgagee at the value of the property rather than the amount of the debt at a time of depressed prices. The debtor retained ownership of the property while the mortgagee, because of its nonrecourse and undersecured status, could not sue for a deficiency and was not paid in full. Moreover, it could not hold the property and hope for an upswing in the real estate market. *See, e.g., Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 704, 720–721, and 855 (1977).

■ Section 1111(b) prevents an encore of *Pine Gate* in two ways. First, if a nonrecourse mortagee is substantially undersecured, so that he dominates the vote of the class of unsecured claims, he may retain the recourse status conferred by Section 1111(b)(1)(A), not electing under Section 1111(b)(2), and cause that class of claims to dissent under the plan. *See,* 11 U.S.C. Section 1126(c). The plan may not be confirmed under these circumstances, *see,* 11 U.S.C. Section 1129(a)(8), absent a cram

down under 11 U.S.C. Section 1129(b)(2)(B). Cram down under Section 1129(b)(2)(B) requires either that the unsecured claims be paid in full or that junior interests receive nothing under the plan. Hence, the debtor must propose a plan which satisfies the unsecured debt or which eliminates his interest in the property. *Cf. In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 831–833 (Bkrtcy.S.D.N.Y.1982). Either option is contrary to the result reached in *Pine Gate.* Second, if the creditor elects under Section 1111(b)(2), he loses his recourse status, and any unsecured claim, but gains an allowed secured claim for the amount of the debt, not the value of the property. Hence, unlike the lender in *Pine Gate,* he may benefit from any increase in the value of the property.[23]

Section 1111(b) seems opposed to the idea of opportunity cost. It is one instance where debtors are deprived of the benefit of their bargain outside bankruptcy. Lenders may escape the nonrecourse term of their agreement. This shows less than complete fidelity to the "benefit of the contractual bargain" which is the polestar of opportunity cost. More important, creditors who elect to remain nonrecourse, to receive an allowed secured claim for the amount of the debt, and to wait for an increase in the value of the property are not interested in foreclosure and liquidation. They want a piece of the going concern bonus; they will gamble for a return from the realty, not from an unrelated market for money. *Cf.*

---

**22.** There is a question whether the deficiency claim of the nonrecourse creditor may receive the benefit intended by the election under Section 1111(b)(2). *Compare, e.g.,* Kaplan, "Nonrecourse Undersecured Creditors Under New Chapter 11—The Section 1111(b) Election: Already a Need For Change," 53 Am.Bank.L.J. 269 (1979) (1111(b)(2) may be available only to recourse undersecured creditors) *with* 5 Collier on Bankruptcy, *supra* ¶ 1111.02[3], at 1111–17 ("This option would appear to apply to recourse and non-recourse creditors alike"); Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 Am.Bank.L.J. 133, 161 and n. 176 (1979) (statute "unclear" but "it would seem that the allowed secured claim will equal the amount of the debt for either a recourse or nonrecourse creditor"); Stein, "Section 1111(b): Providing Undersecured Creditors With Postconfirmation

Appreciation in the Value of the Collateral," 56 Am.Bank.L.J. 195, 202–207 (1982) (statute ambiguous, but Congress probably intended to benefit recourse and nonrecourse undersecured creditors).

**23.** Underscoring, however, that adequate protection is tied to the value of the collateral and the allowed secured claim, sponsors of the Code noted that, even when a creditor makes an election under Section 1111(b)(2), "that creditor is entitled to adequate protection of the creditor's interest in property to the extent of the value of the collateral not to the extent of the creditor's allowed secured claim, which is inflated to cover a deficiency as a result of such election." 124 Cong.Rec. H11,092 (daily ed., September 28, 1978).

*In re BBT,* 11 B.R. 224, 232 (Bkrtcy.D.Nev. 1981).[24]

### OPPORTUNITY COST MAY BE REDUCED THROUGH OTHER PROVISIONS OF THE CODE

Bankers have an adage that "the first loss is the least loss" because delay in collection works harms to a lender. This concern was pressed upon Congress[25] which, in turn, wrestled to reconcile the need of debtors for a "breathing space" to reorganize their affairs and of creditors for expeditious realization on their claims.

Congress, therefore, was aware of the time value of money; it knew that delay would prejudice creditors. Although not requiring debtors to pay interest while a case is pending, Congress provided elixirs for delay elsewhere in the Code.

Out-of-court workouts, for example, are encouraged and facilitated in 11 U.S.C. Sections 305(a), 1102(b)(1), and 1126(b).[26] Section 305(a), in particular, may forbid reorganization under Chapter 11 when one has been accomplished in another forum, because recapitulation may cost more in delay than the gains to be achieved. Section 305(c), by making the order of dismissal nonappealable, and by preventing further disruption of the workout, accentuates this policy. *See, e.g., In re Colonial Ford, Inc.,* 24 B.R. 1014 (D.Utah, 1982). *See generally,* Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-for-Lawyers-Bill, Part V: Business Reorganization," 1982 Utah L.Rev. 1, 37–39; Trost, "Business Reorganizations Under Chapter 11 of the New Bankruptcy Code," 34 Bus.Law. 1309, 1324–1325 (1979).

Creditor relief, during the course of a case, receives priority. Hearings for relief from stay are accelerated under Section 362(e). Hearings for dismissal or conversion, while more deliberate, nevertheless may ameliorate injury which is collective rather than individual and which is caused by delay. *See, e.g.,* 11 U.S.C. Section 1112(b)(3); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 828 (Bkrtcy.S.D.N.Y. 1982); *In re American Mariner Industries, Inc.,* 10 B.R. 711, 713 (Bkrtcy.C.D.Cal.1981).

**24.** In this regard, Section 1111(b) demonstrates that delay is not always the nemesis of secured creditors. One banker, for example, who testified in hearings before Congress noted that "pace" may be important in reorganization and "in a real estate situation, it may be advantageous to delay; whereas in other situations where there is an obvious 'dead duck,' then it may be advantageous to liquidate quickly and preserve as much money as possible for the shareholders and creditors." *Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 599 (1977). *Cf. In re Castle Village Company,* 3 B.C.D. 588 (S.D.N.Y.1977). *But cf. In re BBT, supra* at 230.

Moreover, it has been argued that classes of claims are exposed to different risks depending upon whether or not they elect under Section 1111(b)(2), and hence that they are entitled to a different present value under 11 U.S.C. Section 1129(b)(2)(A)(i)(II). *See,* Blum, "The 'Fair and Equitable' Standard For Confirming Reorganizations Under the New Bankruptcy Code," 54 Am.Bank.L.J. 165, 167–172 (1980). If present value is altered, then opportunity cost, which is akin to present value, may also be changed by the election. The Code, however, does not specify when the election must be made, leaving this determination to the Rules of Bankruptcy Procedure. The election, if it is to be an informed one, must await the treatment of the class of claims in a proposed plan. Consistent with this view, the election might be made at any time before the hearing on the disclosure statement under 11 U.S.C. Section 1125. *See,* Proposed Rule 3014, Preliminary Draft of Proposed New Bankruptcy Rules and Official Forms, Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (March 1982). What opportunity cost should be paid pending this election? Or what if the election is withdrawn, because a proposed plan is modified, or because another plan is submitted? The difficulty of these questions underscores the problem of opportunity cost.

**25.** *See, e.g., Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess., Ser. 27, pt. 4, at 2116–2117 (1976). *Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 490 and 599 (1977).

**26.** *See, e.g.,* 124 Cong.Rec. H11,102 (daily e., September 28, 1978).

*Cf. In re Koopmans,* 22 B.R. 395, 401–402 and n. 14 (Bkrtcy.D.Utah 1982).

Litigation in general, brought by the debtor or other parties in interest, which may further rehabilitation, will not be obstructed through contests over jurisdiction in light of 28 U.S.C. Section 1471: "Actions that formerly had to be tried in State court or in Federal district court, at great cost and delay to the estate, may now be tried in the bankruptcy courts." H.R.Rep. No. 95–595, *supra* at 445, U.S.Code Cong. & Admin. News, p. 6400. *See generally,* Kennedy, "The Bankruptcy Court Under The New Bankruptcy Law: Its Structure and Jurisdiction," 55 Am.Bank.L.J. 63, 85–86 (1981).[27]

Reorganization personnel are assigned new roles. Judicial and SEC superintendence of the estate is reduced, because under former law, their scrutiny of plans impeded reorganization: "The approval process [was] generally a long and intricate process. The hearing frequently span[ned] months." H.R.Rep. No. 95–595, *supra* at 222 and 225, U.S.Code Cong. & Admin. News, pp. 6184–85. Administrative oversight is replaced by the disclosure requirements of 11 U.S.C. Section 1125, leaving "the public and all classes of creditors and equity security holders of the debtor ... protected without the time-consuming process of an approval hearing and an SEC Advisory Report in every case." *Id.* at 231, U.S.Code Cong. & Admin.News, p. 6190.[28] Similarly, unlike Chapter X, a trustee is not automatically appointed, but the debtor remains in possession, because "[a] trustee frequently has to take time to familiarize himself with the business before the reorganization can get under way. Thus, a debtor continued in possession may lead to a great-

er likelihood of success in the reorganization." *Id.* at 233, U.S.Code Cong. & Admin. News, p. 6192. Creditor committees which have an interest in expedition bear the onus of administration. Private control is encouraged, judicial interference, with its attendant delay, is frowned upon. *Cf. In re Curlew Valley Associates,* 14 B.R. 506 (Bkrtcy.D.Utah 1981).

Formulation and confirmation of a plan are quickened. Uncertainty in choosing between Chapter X and Chapter XI is removed through a consolidation of proceedings in Chapter 11. Parties preferred Chapter XI under prior law, even though it did not provide a "completely effective remedy for a business undergoing financial difficulty," because "more often than not, speed in the reorganization attempt [was] more important to success than the scope of the reorganization." H.R.Rep. No. 95–595, *supra* at 222, U.S.Code Cong. & Admin. News, p. 6182. And if threatened with a motion to convert to Chapter X, "[r]ather than undergo the costly ... litigation needed to determine whether the case should proceed under chapter X or XI, the debtor, again interested in speed, [would] adjust the plan to satisfy whatever group [had] threatened a conversion motion." *Id.* at 223, U.S.Code Cong. & Admin.News, p. 6182. The exclusive right to file a plan, available to debtors under Chapter XI, is abridged in 11 U.S.C. Section 1121, "because by delay [debtors could] force a settlement out of otherwise unwilling creditors." *Id.* at 231, U.S.Code Cong. & Admin.News, p. 6191. Indeed, under the new order, if "a debtor delay[s] in arriving at an agreement, the court [may] shorten the period [of exclusivity] and permit creditors to formulate

---

**27.** The provision for abstention from civil proceedings in Section 1471(d), like its counterpart for cases in Section 305(a)(1), is nonappealable in order to minimize protracted disputes over jurisdiction. *See also,* 28 U.S.C. Section 1478(b).

**28.** For the same reason, appeals by the SEC are disallowed: "An appeal by an agency that had no direct interest in the case when none of those with money involved can be persuaded to take an appeal could cause delay to the detriment of the debtor, the creditors, and the stock-

holders ... As had frequently been pointed out in connection with the need for a valuation hearing, or diagnosis of the debtor, the patient may die on the operating table while the lawyers are diagnosing. The public protection policy of the securities laws must be balanced with the protection of creditors rights in bankruptcy cases, which is frequently facilitated by speed in the reorganization process." H.R.Rep. No. 95–595, *supra* at 229, U.S.Code Cong. & Admin.News, pp. 6188–89.

and propose a reorganization plan." *Id.* at 232, U.S.Code Cong. & Admin.News, p. 6191. Enterprise valuations, described as "a time-consuming and inherently uncertain process," *id.* at 222, U.S.Code Cong. & Admin.News, p. 6181, may be avoided through nonimpairment under 11 U.S.C. Section 1124 or creditor consent under 11 U.S.C. Section 1129(a)(8). *Cf. In re Barrington Oaks General Partnership, supra.* "In a reorganization where time is of the essence, the length and uncertainty of the valuation process is no longer justified in every case." H.R.Rep. No. 95–595, *supra* at 222, U.S. Code Cong. & Admin.News, p. 6181. In short, "[i]n opting for a flexible reorganization chapter and in rejecting the formality of Chapter X, the draftsmen of the Code focused upon an issue that [others have] occasionally failed to recognize, namely, that in the contemporary financial world high interest rates and delay in making distributions under a plan of reorganization impose a substantial economic penalty on creditors who are generally not entitled to interest on their claims after the filing date. Since delay in making distributions is likely to reduce the present value of a creditor's recovery, the Code limits the time in which a debtor has the exclusive right to file a plan of reorganization and permits confirmation of a chapter 11 plan which provides for the liquidation of the debtor's assets." 5 Collier on Bankruptcy, *supra* ¶ 1109.01, at 1109–10—1109–11.[29]

Debtors need not pay opportunity cost in light of these antidotes for delay found in the Code.

**CONCLUSION**

Adequate protection is the fulcrum upon which the rights of debtors and creditors are balanced in a reorganization case. Congress knew that the payment of interest would be an impossible burden for debtors, many of whom file because of cash shortages. Congress allowed "periodic cash payments" in Section 361(1), but these are keyed to depreciation, not interest, and they are optional, not mandatory. If interest were required, it would run afoul of the nonprescriptive character of Section 361, as well as other provisions of the Code.

Congress, however, did not leave creditors unarmed against the attrition in values worked by time. Creditor plans, plans of liquidation, and the power of dismissal are remedies, among others, tailored to solve the problem of delay. Adequate protection, which preserves the allowed secured claim and these prophylactics against obstruction in a case complement one another. Accordingly, the court holds that this debtor need not pay interest to compensate GEMC for its "opportunity cost" in order to supply adequate protection.

---

**29.** Homer Kripke, a leading securities and bankruptcy analyst, echoed these views: "While the critics (and I) do not question the overall value of the SEC's participation, the critics have focused on the SEC's approach to valuation and its seeming disregard of the time value of money, *i.e.,* disregard of the lapse of time necessary before the SEC's expected normal earnings will be achieved, and the discounting that should be necessary because of that fact. Similarly, the SEC seems totally to have failed to realize the cost to all parties of the delay and disruption caused by the delay of long-term Chapter X proceedings... The SEC stands alone, except for a few academic sup-

porters, in failing to revise its judgment as to the comparative weight of the benefits to be derived from these protections as against the costs in delay resulting from the application of these protections. Therefore, the constituency which trustees and the SEC serve are far more interested in a rapid conclusion of a plan, with as much fairness as practical realities permit, than in a long destructive delay in a pursuit of an illusory standard of accuracy and perfection, which could be appealed by individual security holders at the cost of still further delay." H.R.Rep. No. 95–595, *supra* at 259–260, U.S.Code Cong. & Admin.News, pp. 6218–19.