**In re XB–1 ASSOCIATES, Debtor.**

**GENERAL ELECTRIC CREDIT CORPORATION, Plaintiff,**

v.

**XB–1 ASSOCIATES, Defendant.**

**Reorganization No. 82 B 12090 (PBA). Adv. No. 82–6355–A.**

United States Bankruptcy Court, S.D. New York.

Feb. 24, 1983.

Raff, Scheider & Wiener, Newark, N.J., for General Elec. Credit Corp., Alan D. Wiener, Newark, N.J., of counsel.

Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, for XB–1 Associates; Daniel A. Zimmerman, New York City, of counsel.

DECISION AND ORDER VACATING AUTOMATIC STAY AS TO GENERAL ELECTRIC CREDIT CORPORATION

PRUDENCE B. ABRAM, Bankruptcy Judge:

The trial of the above-entitled adversary proceeding was conducted before me on December 21 and 28, 1982 and on January 17, 18 and 21, 1983. Based upon the complaint, the amended answer and upon the record,

the undersigned makes the following findings of fact and conclusions of law:

1. XB–1 Associates ("XB–1"), the debtor, filed its petition for reorganization under Chapter 11 in this court on October 27, 1982 and was automatically continued in the operation of its business and the possession of its property as a debtor-in-possession.

2. No creditors committee has yet been appointed. The schedules and statement of affairs have not yet been filed nor has a plan of reorganization been filed.

3. XB–1 is a New York limited partnership and its sole general partner is XB Drilling Corporation ("Drilling"). Drilling is a wholly-owned subsidiary of Xoil Energy Resources, Inc. ("Xoil").

4. XB–1 has been in the business of on-shore contract drilling for oil in the United States although it has not engaged in any drilling operations since September 1982. XB–1 owns two non-mobil, land, oil drilling rigs, which it has used in its business.

5. These two rigs, known as Rig 1 and Rig 2, are the subject of a valid and perfected security interest in favor of General Electric Credit Corporation ("GECC"), acquired in connection with a loan agreement dated November 10, 1980. Although GECC's security agreement describes the security interest more broadly, for all practical purposes its collateral consists of these two rigs and spare parts and the collateral will hereafter be referred to as the Rigs.

6. XB–1 is admittedly in default under the loan agreement, primarily due to non-payment. The amount due to GECC on the loan exceeds $4 million.

7. On November 3, 1982, GECC commenced this adversary proceeding seeking, inter alia, a lifting of the automatic stay to permit it to repossess the Rigs and, alternatively, seeking adequate protection.

8. XB–1 does not have any equity in the Rigs. At the commencement of the trial, XB–1 and GECC stipulated the Rigs had a value of $2 million, although a dispute exists over whether the stipulated value is a going concern or a liquidation value.

9. The only asset other than the Rigs which XB–1 has is the remainder, if any, of the so-called Conoco receivable which amounted to approximately $170,000. The amount was received by XB–1 from Conoco on account of the last operation of Rig 2.

10. Rig 1 is slightly smaller than Rig 2, meaning that it cannot dig as deep a well as Rig 2. Rig 1 has not been used since March, 1982, and was left in a "scattered stack" position by the debtor. This scattered stack position was conceded by XB–1's own representative's testimony not to be the proper method of stacking the Rig for relatively long periods of non-use of the equipment, and it was further conceded that certain preventative maintenance measures are both necessary and proper to prevent deterioration in the condition of the equipment, and its subsequent value. While XB–1 has made a few attempts to bid on and locate jobs for the use of Rig 1, it has not been successful in obtaining contracts for Rig 1 since March, 1982. XB–1 has no present prospects for the use of Rig 1 and intends to leave this rig stacked for an indefinite period of time.

11. Rig 2 has not been in use since the end of September, 1982 and was also left in a scattered stack position, without the preventive maintenance proper for anticipated long periods of non-use. XB–1 did not undertake to implement the proper stacking and preventative maintenance on either Rig 1 or Rig 2 until ordered to do so by this Court on December 28, 1982. XB–1's attempts to locate work since September, 1982 for Rig 2 have also been unsuccessful in that no contracts for work have been entered into although the debtor believes that it will obtain a two-hole drilling contract in the near future.

12. There are three basic types of drilling contracts which the owner of a rig can obtain (the owner of the rig in the industry being called a "contractor," and the owner of the well site, either being an absolute owner or an owner by leasehold right, being called an "operator"). The three types of

drilling contracts are turn key, footage, and day rate. The turn key operation places the most risk on the contractor in terms of the problems that can occur in the drilling operation and the cost that the contractor would be required to bear. The footage contract provides for the contractor to be paid a certain dollar per foot that the well is dug, and has less risks to the contractor than the turn key operation. The least risky to the contractor is the day rate contract, under which the contractor is paid per day of operation irrespective of the number of feet drilled during that day. In addition, under the day rate form of contract, the operator assumes certain costs incidental to the operation of the well which are not assumed by the operator under either the turn key or footage type contracts. In evaluating a bid for a proposed contract, the contractor considers various factors, including the well site, the formation, the problems which it can reasonably encounter in drilling the well, the amount of days he estimates it would take to drill to a certain footage, and the amount of expendables and replacement parts that may be needed. Currently few day rate contracts are available although they were prevalent in better times; bidding is currently generally on turn key and footage contracts. Prices being paid under contracts are lower than formerly and competition is driving prices down, sometimes to cost or below.

13. Both XB–1 and GECC admitted through testimony that the drilling market has in the past year or so been extremely depressed because of the decrease in demand for oil and the oversupply of oil rigs. This has greatly decreased the demand for rigs, the types of contracts and the rates contractors can obtain for drilling contracts, as well as the value of drilling rigs. Both parties further admit that they cannot predict that the downward trend in the demand for the rigs and value of the rigs will not continue in the immediate near future or longer, although XB–1 asserts some evidence that market activity has increased recently and seeks to draw from that the possibility of an upward trend in the market.

14. At the commencement of the trial, GECC presented two witnesses, the first, Steven Bogard, an experienced appraiser of equipment, particularly oil rigs, and the second, Kenneth Olden, an individual who has numerous years of experience in the operation and maintenance of oil rigs. The appraiser had examined the Rigs in September, 1982 and again on December 8 and 9, 1982. The testimony of these witnesses, and the photographic evidence introduced, clearly indicates that the "scattered stack" condition of the Rigs was inappropriate for long periods of inactivity of the Rigs and that the Rigs would be potentially susceptible to deterioration in condition and value as a result. For instance, XB–1 failed to properly dope the thread ends of the drill collars and pipe, to put protectors on the drill pipe and collars, to hang the swivel properly, and to protect electrical equipment from the elements. XB–1 admitted that it did not restack the Rigs because of lack of funds. The witnesses for GECC and XB–1 all agree that the best method of maintaining the condition and value of the Rigs is to have them actually in use and properly maintained. Mr. Olden testified, based upon his observation of the Rigs and his lack of knowledge of the past use of same, as to the costs he thought would be required to be expended to put the Rigs in operable condition. However, inasmuch as he admitted that much of the work and costs, as estimated by him, were based upon his inability to locate all the necessary components of the Rigs and his lack of detailed knowledge of the actual use of the Rigs, the court does not find his testimony dispositive of the motion and the court will not make specific findings as to each of the various items testified to by Mr. Olden. Both of the witnesses for GECC testified that they were unable to locate at the various location sites various major components of the Rigs. XB–1 testified, as discussed below, that the major missing parts are on loan to entities related to Xoil, for which use no rental or other compensation is being paid to XB–1. Mr. Bogard, based on his experience, was of the opinion that the Rigs given

their condition and market conditions, are depreciating at the rate of 5% per month.

15. At the conclusion of the hearing on December 28, 1982, this court ordered the automatic stay under Section 362 of the Bankruptcy Code to continue until the conclusion of the trial on the following conditions: (a) XB–1 pay to GECC a sum equal to twelve (12%) percent per annum on the stipulated value of $2,000,000.00, said sum to be paid monthly, and (b) XB–1 immediately commence and diligently proceed to stack the Rigs in a proper manner. At the continuation of the trial on January 17, 1983, GECC indicated that XB–1 had, on that date, paid the required monthly payment, $20,000.00, as ordered by this court, and indicated that although some actions had been taken to restack the equipment, GECC questioned the extent of the actions of XB–1. XB–1 then produced Mr. John Klingler, President of Drilling, the general partner of XB–1 who testified that after the order of this court on December 28, 1982, some work had been commenced to restack the Rigs, but that there was further work that had to be done. The court is satisfied that XB–1 did undertake a good faith effort to comply with the December 28 direction.

16. Mr. Klingler's primary responsibility for XB–1 is to attempt to locate work for the Rigs and he prepares and puts out bids for contracts for the Rigs. Mr. Klingler has a similar responsibility for two other rigs, which were referred to during the trial as Rigs 3 and 4. Neither XB–1 nor GECC has an interest in Rigs 3 and 4.

17. Mr. Klingler testified that the major components of Rigs 1 and 2 that Messrs. Bogart and Olden were unable to locate had been switched with components of a similar nature on Rigs 3 and 4. In some cases, components from Rigs 3 and 4, which rigs have a larger capacity, were switched to Rigs 1 and 2 as they were needed for various drilling jobs for which Rigs 1 and 2 were contracted in late 1981 and early 1982. These components have not, to date, been switched back and Rig 4 is still utilizing on a job some of the components belonging to Rigs 1 and 2.

18. XB–1's present prospects for the use of Rig 1 are non-existent. XB–1's prospects for the use of Rig 2 are little better. Mr. Klingler testified as to his efforts to find work for Rig 2. He has placed several unsuccessful bids over the last few months. At present, the only prospect of work for Rig 2 is the prospect, but not the assurance, of a two-well contract for Rig 2. The proposed contract is part of a drilling program that Xoil is apparently attempting to put together. Mr. Klingler was aware that there were contingencies to Xoil's being able to go forward with the program and that such contingencies included funding. However, as he was not involved in the development of the drilling program for the two wells, other than the preparation of a bid to do the drilling, Mr. Klingler could not testify as to the probability that all contingencies would be met. The rate for the proposed contract for the two wells is in excess of the normal rate which could be obtained by a contractor for a similar type well in an arm's length transaction and in addition is a combined footage/day rate contract at a time when few day rate contracts are being given. The only apparent reason for the favorable nature to XB–1 of this possible contract is the relationship of Xoil to Drilling and thus to XB–1.

19. Cash flow projections for the proposed contract which had been prepared by Mr. Klingler were admitted at trial. Even assuming all of the projections and assumptions made are accurate, XB–1 would not receive the first payment under the proposed contract until at least thirty days after commencement of drilling operations. Operating expenses would have to be paid by XB–1 prior to the date when it could expect to receive revenues and this would result in a temporary negative cash flow. XB–1 testified that Xoil was prepared to advance funds to it to cover the cash flow deficit if the drilling program was prefunded and if the advances to XB–1 were given the status of a super-priority claim pursuant to an appropriate order of this court. Given Xoil's financial position, discussed be-

low, reliance on it by XB–1 appears unwarranted. Further, Mr. Klingler testified that he had in the past drilled holes for which no payment was received and that consideration of the financial responsibility of the entity for which the work is being done was an important consideration in bidding on a job. Mr. Klingler admitted that he had taken no investigatory steps with respect to Xoil to satisfy himself about XB–1's ability to get paid.

20. The cash flow projections for the proposed contract were based upon a number of assumptions. Among the key assumptions are those relating to expenses for parts and repairs and the length of the job. This court is satisfied that the risks assumed by the contractor are such as to create substantial uncertainty as to the ultimate accuracy of the estimates. To the extent the projections prove inaccurate because of under estimates the projected positive cash flow is adversely affected. Moreover, on an arm's length contract footage rate basis, there would be no positive cash flow from the proposed contract. Mr. Klingler also testified that the contractor is not protected by insurance against loss or destruction of the rig occurring during drilling operations.

21. Mr. Alan Alpern, Chairman of the Board of Drilling, and President of Xoil was called as a witness by XB–1 on January 21. Mr. Alpern indicated that he and his counsel had begun approximately two weeks earlier to draft a plan of reorganization and that XB–1 expected to be in a position to file a plan within four weeks. The tentative outline for a plan contemplates its funding by means of additional contributions from the limited partners of XB–1. Mr. Alpern believes that such contributions would be encouraged by the adverse tax consequences that would occur to the limited partners if XB–1 lost its ownership of the Rigs. XB–1 has not, however, made any firm proposals to the limited partners, and has not received any commitment from the limited partners to inject any additional funds into the capital structure of XB–1. Mr. Alpern testified that the tax incentives alone might not be a sufficient motive for additional investment and that long term economic viability of the partnership was also necessary. Mr. Alpern conceded that he was not an expert on the drilling market and XB–1 did not produce any witness able to establish the future economic viability of XB–1 based upon present market conditions.

22. Mr. Alpern confirmed a recent press release about Xoil which indicated an expected loss for Xoil for fiscal year 1982 of approximately $8,200,000, and which further reported that the company's auditors would have to give a "going concern" qualification to their financial report of Xoil unless Xoil was successfully able, prior to the auditors' report, to restructure its short term debt and demonstrate its ability to attain a positive cash flow during 1983. There was no indication that Xoil would be able to satisfy the auditors' concerns.

23. GECC produced testimony as to its projected use of the Rigs if it obtained the Rigs. As part of a contingency program for not only the XB–1 Rigs but rigs of other entities in which GECC has an interest, GECC has been formulating a plan for utilization of the rigs returned to it. On January 17, 1983 GECC concluded a management agreement with a newly formed entity which would manage the operation of rigs for the benefit of GECC. There are presently four other rigs available to GECC in addition to the XB–1 Rigs. This contingency program, as implemented, appears likely to enable GECC to use both Rig 1 and Rig 2 as GECC indicated that there are contracts for the use of the Rigs if the Rigs were turned over to GECC. GECC is prepared to make a capital commitment to its program and its projections reflect that it will receive an acceptable rate of return on its original $4 million plus investment in the Rigs over the next several years. GECC's expectations may, of course, be disappointed but the court finds that GECC's expectations and provisions respecting use of the Rigs are both more realistic and more promising than those of XB–1.

24. XB–1 has made a proposal for adequate protection in its post-trial submissions. The proposal includes provision for appropriate restacking of the Rigs, the running of engines on a periodic basis and inspection visits by GECC. The key part of the proposal is the making of monthly payments to GECC equal to 1% of the value of the Rigs, as such value is determined by the court, which value is to be initially fixed at $2 million, to cover any decrease in the value of the Rigs resulting from XB–1's use of the Rigs. In addition, XB–1 proposes to grant GECC a security interest in any drilling contracts and accounts receivable generated, subject to vendor's, mechanic's or materialmen's likes, to secure any decrease in value resulting from XB–1's use of the Rigs. In addition as part of its proposal, XB–1 agreed to file a plan of reorganization within thirty days.

### CONCLUSIONS OF LAW

1. On this motion to lift the stay, XB–1 had the burden of proof on all issues, other than the issue of the debtor's equity in the Rigs, under Bankruptcy Code § 362(g). The burden on GECC as to equity has been met by the stipulation of a $2 million value. XB–1 has not met its burden of proof as to the issues raised by the motion has failed to satisfy Bankruptcy Code § 362(d)(1) in that it has not and is unable to supply adequate protection to GECC.

2. Adequate protection has not been, and cannot be, provided against (a) possible damage to and deterioration of the Rigs during XB–1's possession or use of the Rigs, and (b) any decrease in value of the Rigs occasioned by general market and economic conditions. Indeed, XB–1's proposal expressly excludes protection against market loss.

3. The debtor's inability to satisfy the adequate protection standard is sufficient. In addition, there has been no showing that reorganization without the Rigs is impossible and therefore there has possibly been a failure to satisfy Bankruptcy Code § 362(d)(2). However, even if the court is prepared to assume that the Rigs are necessary to an effective reorganization, the debtor would not prevail since it has not provided adequate protection.

4. GECC is entitled to relief from the automatic stay and the stay is hereby vacated. The debtor is enjoined from using the Rigs and is directed to turn over possession of the Rigs to GECC.

5. Given that the debtor has assets in the form of the Conoco receivable dismissal of this case is inappropriate at this time. Conversion of this Chapter 11 case to a Chapter 7 case at this time is not necessary for the protection of GECC and the court will not now direct conversion.

### DISCUSSION

Valuation of the collateral is at the heart of any adequate protection dispute.

> "The fundamental point is that valuation should not be used as a device to pass the risk of continued operations to creditors while at the same time premature anticipation of a possible liquidation should not permit termination of a case which could produce a higher return if continued. As was noted by the Congress, such considerations can only be decided on a case by case basis and upon equitable considerations arising from the facts of the case." 2 *Collier on Bankruptcy* (15th Ed.) ¶ 361.-02 at 361–16 to 361–17.

On the first day of the trial, the debtor and GECC stipulated that the Rigs had a value as of the commencement of the trial of $2 million. Subsequently, the debtor sought to be relieved of this stipulation in order not to be held accountable for any diminution that might occur by virtue of the operation of market forces and further sought to have that value fixed as a going concern valuation. However, this court does not believe that in the final analysis the decision in this case turns on the dollar value placed on the collateral. Rather the decision turns on two unrefutable facts: first, the markets for the sale and the use of these types of rigs have plunged dramatically in the last year and a half and the market for sale of rigs continues downwards, although the

market for use of rigs may have stabilized; and two, that the Rigs are not insured against loss, damage or destruction during drilling operations. The debtor's only asset consists of the so-called Conoco Receivable which totalled $170,000, some of which has been spent to protect and maintain the Rigs. There is no way that XB–1 Associates can provide adequate protection against the vagaries of market fluctuation because of the difficulty of predicting and quantifying it because no source for payment exists; likewise, XB–1's resources are insufficient to provide any meaningful protection against the risk of physical loss or damage during a drilling operation.

Valuation of these oil rigs at this time must be premised on their use. Although GECC's proposed use of the Rigs has certain uncertainties and imponderables, this court believes that such use presents a greater likelihood of recovery to GECC than would occur from the very uncertain use XB–1 proposes for the Rigs.

Although the decision predates the enactment of the Bankruptcy Code, the opinion in *In re American Kitchen Foods, Inc.,* 9 CBC 537 (Bkrtcy.D.Me.1976) remains instructive on the difficult issues confronting the bankruptcy court in a dispute between a secured party and a debtor.

"Debtors in possession, receivers or trustees should not be facilitated in their efforts to foist upon the secured party the risk of collateral depletion or diminution, including the risk of diminution due to declines in market value, where the collateral was retained at the instance and for the benefit of the debtor, rather than the secured creditor. The controlling concept is one of fundamental fair play. The risk of loss should pass from the party in jeopardy to the one who placed him there. A secured party isolated from its collateral is entitled to recoup losses occasioned by the depletion and diminution of its collateral from inception of the arrangement proceedings to abandonment or reclamation of the collateral or to the adjudication or dismissal of the arrangement proceedings." 9 CBC 553–554.

Given the debtor-in-possession's business prospects, there is little or no source from which GECC could be compensated for any loss occasioned by its forced isolation from the collateral. A look at the factors which persuaded the court to permit the debtor-in-possession to retain the collateral in *American Kitchens* is instructive:

a) The debtor continued to operate as a going concern.

b) The collateral was being preserved in excellent condition.

c) Active retail and institutional markets continued to support an average markup for the debtors' products approximately one-third over cost.

d) Valuation at forced sale levels would constitute a clear repudiation of the commercial realities.

e) There was no question that the collateral could be converted into cash in the ordinary course of business at prices ranging from 30% to 80% above forced sale recovery levels. 9 CBC at 552.

None of these factors is present in this case. XB–1 is not operating as a going concern and has not so operated since well before the Chapter 11 case was filed. The collateral was not being preserved in excellent condition and even with the court's directive to rectify the physical problems, the collateral is probably only in fair to good condition. The market for drilling contracts for rigs like the two rigs is poor and many available contracts are at or below break-even prices. Commercial realities are such that the debtor-in-possession should not be allowed to gamble with the secured creditor's property and XB–1 has no commercially viable prospects for the sale of the Rigs and few prospects for the use of the Rigs. Finally, the business prospects for XB–1's use of the Rigs do not indicate that they will realize more than, or even as much as, GECC can realize through its established program for rig utilization.

XB–1 has also failed to deal with a central problem in this case—the effect of market conditions on value. GECC is entitled to compensation for loss occasioned by the

stay. Such loss includes diminution to market value, even though GECC has no present intention to sell the Rigs. GECC's return from operation of the Rigs depends on market conditions and secured creditors are not limited to outright sale in an attempt to recover on their collateral. The court finds Judge Mabey's decision in *In re South Village, Inc.*, 25 B.R. 987 (Bkrtcy Ct.D. Utah, 1982) instructive. Judge Mabey rejects a contention by the secured creditor, who happened to be GECC, that it was entitled to compensation for the loss of the time value of money, and found that compensation was due only for the depreciation in value of the collateral. It is precisely depreciation which turns the tide in this case.

This court is persuaded on the basis of all the testimony that GECC cannot be afforded adequate protection if the Rigs remain in the possession of XB–1 for the reasons set forth above. Therefore, GECC is entitled to relief from the automatic stay. The debtor is enjoined from using the Rigs and is directed to turn over possession of the Rigs to GECC forthwith. GECC's motion for conversion or dismissal of this case will be denied at this time.

SO ORDERED.