**In re Michael E. BESSEY, dba Corinthian Yacht & Ship Brokerage, Debtor.**

**Bankruptcy Nos. 85–04500–LM11, RS–1948.**

United States Bankruptcy Court, S.D. California.

Oct. 6, 1986.

Lynn R. McDougal, McDougal, Meloche, Love & Eckis, El Cajon, Cal., for creditor.

Colin W. Wied, Wied & Smelko, San Diego, Cal., for debtor.

MEMORANDUM DECISION

LOUISE DeCARL MALUGEN, Bankruptcy Judge.

Dr. John D. Todd ("Dr. Todd"), holder of a note secured by a second deed of trust on the residence of Michael Bessey ("Bessey"), has moved the Court to vacate the automatic stay to permit him to foreclose on the Bessey residence. Bessey resists, claiming the security interest of Todd is worthless and need not be adequately protected.

## FACTS

Bessey purchased his luxury residence in Del Mar, California, from Dr. Todd in December 1982. The residence was new when purchased, having been constructed by Dr. Todd and his son. The debtor now claims that Dr. Todd, who holds his note as partial payment of the purchase price, is neither entitled to adequate protection nor relief from the automatic stay because he is an unsecured creditor by reason of some very unique circumstances. It is uncontroverted that the Bessey house is sliding down the hill which serves as a foundation for its expansive ocean view. Bessey has filed a state court lawsuit against Dr. Todd for negligence and fraud. As might be expected, Bessey and Dr. Todd sharply disagree on the measures to be taken to remedy the problems with the residence and the cost of those measures. However, it is clear that both parties have relied on the report of Philip H. Benton of Benton Engineering, Inc., in arriving at their opinions as to the nature of the remedial steps which need to be taken.

Philip H. Benton ("Benton") is a registered civil engineer who has specialized in soils engineering for 37 years. He visited the Bessey residence repeatedly over a six month period, investigating the cause of numerous cracks in the concrete patio, floor slabs and masonry walls of the house and garage. Benton's investigators hand dug seven test pits, taking samples of the soil at various points around the perimeter of the house. His conclusions contained in three reports (which he explained are cumulative) are that the residence was built on uncompacted fill " ... well below the minimum specifications of the various Building Departments in the City and County of San Diego...." Because the fill soil is not properly compacted, ground water and rain water saturate the improperly compacted fill soil, causing the fill to settle at a different rate than that portion of the house located on undisturbed natural soil. Simply put, the house has a decided northwest tilt and its northwest corner is continuing to slip down the hill. In his final (January 13, 1986) report, Benton recommended:

> In order to prevent this probable future settlement from damaging this house, it is recommended that the perimeter and bearing wall footings be underpinned by 3 feet square pier footings excavated to two feet into the medium firm to firm natural light red brown clay fine to medium sand soils beneath the fill soils.

Dr. Todd presented two experts who testified concerning the cost of implementing the Benton recommendations and repairing some of the existing damage. Robert K. Fogg ("Fogg"), an experienced civil engineer, and George E. Eckel ("Eckel"), a licensed building contractor, inspected the Bessey residence and relying on the Benton report, determined that the cost to repair the residence using a concrete pier method was approximately $29,500. The concrete pier method would involve manual excavation of pits beneath the house and patio to a depth necessary to reach firm soil. Concrete would then be poured into the pits to construct columns or piers to provide additional support for the house and patio slabs.

Eckel testified that in arriving at his estimate of construction costs attendant to repair the residence, he did not read Benton's reports, but relied on Fogg's interpretation of those reports. Relying on Fogg's interpretation and suggestions for placement of the piers, his estimate provided for 23 piers to be placed mostly on the north and west side of the residence and under the patio slabs. Under cross-examination, Eckel admitted that his estimate did not include the following:

1. Repair and maintenance of the garage slab;

2. Repair and maintenance of the floor slab;

3. Repair, removal and/or replacement of the retaining wall;

4. The cost of a civil engineer drawing plans;

5. The cost of permits;

6. The cost of repainting;

7. The cost of removing water which might seep into the pits.

8. The cost of labor and materials to shore the pits during excavation.

9. The cost of repairing the exterior cosmetic defects caused by the subsidence (such as filling and painting exterior wall cracks and replacing or repairing cracked trim).

The debtor introduced testimony of Chester Carville, a licensed civil engineer and a contractor specializing in foundation work. Relying on the Benton reports, Carville estimated that work which was required " ... to stop the building and appurtenance structure distress and to make reasonable cosmetic repair to the structure for damages resulting from the distress" would cost $196,210. Carville also proposes to use a concrete pier method of repair.

In addition, Carville opined that certain optional repair work might be required, depending upon " ... further evaluation by the soils and structure engineer." The optional work included such items as house floor slab replacement, if necessary; garage floor slab replacement, if necessary; installation of additional reinforcing steel and total removal and replacement or structural resupport of the retaining wall. The optional items (based on an apparent worst-case analysis after further engineering studies) could cost an additional $127,800.

Carville's estimate differs significantly from that of Eckels and Fogg. For example, while Carville would underpin all exterior and interior bearing wall footings with piers (requiring 59 piers to be constructed) Eckels would only construct footings on the north and west sides of the residence, requiring only 23 piers. Further, Carville and Eckels disagree sharply on the amount of time necessary for laborers to excavate the three-foot square pits required for the piers and whether such excavation could be accomplished without shoring or provision for removal of ground water which could seep into the pits.

Other significant differences between the experts' cost estimates are in the following areas:

1. Construction of a sub-drain system and replacement of landscaping. Carville estimates that installation of a sub-drain system, regrading the yard around the entire house and garage to provide positive drainage and re-landscaping and replacing walks, fences and other improvements disturbed or removed in that operation would cost $33,000. Eckels' estimate does not provide for installation of a sub-drain system and has an allowance of only $1,500 for regrading and re-landscaping.

2. Carville's estimate includes such items as engineering plans, permits and permit fees ($2,350), exterior cosmetic repairs ($9,000) and interior cosmetic work ($15,700), all of which items were omitted from the Eckels estimate.

Having considered the testimony of Carville on the one hand and Eckels and Fogg on the other, and evaluated the reasoning behind each of the expert's preferred estimates of repair, the Court is persuaded that the Carville estimate is a more accurate estimate of the cost of remedial repairs to the Bessey residence than the Eckels/Fogg estimate. The Court's finding is further strengthened by the fact that sometime shortly before this trial was concluded, Bessey's homeowner's insurance company accepted the Carville proposal and employed Carville to make the repairs in accordance with it.

In order to determine whether Dr. Todd is a secured creditor entitled to adequate protection, the parties submitted evidence on the issue of the value of the residence. Dr. Todd offered the testimony of Lester O. Gardner, Jr., a real estate appraiser. Gardner appraised the residence as having a fair market value of $375,000, " ... [assuming] no structural damage to the subject as of the date of the appraisal and also [assuming] no detrimental stigma due to soil problems in this neighborhood. In other words, the estimate of market value given ... represents the value suggested by the market data researched as if no soils

problems exist in either the subject or the subject neighborhood." (Appraisal dated February 10, 1986, p. 2).

Gardner also offered his opinions concerning the effect of stigma on the value of the property having had a known subsidence problem even if repaired. Gardner stated that based on his experience, even assuming the property was repaired, the stigma effect would depress any asking price by at least 15 percent. However, as revealed in cross-examination, the properties used by Gardner as "comparables" to analyze the effect of subsidence stigma on fair market value were significantly less valuable than the debtor's residence. Presumably, the effect of stigma would be greater on the more valuable Bessey residence, which would appeal (or not appeal) to a more affluent and discriminating pool of buyers.

The debtor introduced the testimony of Timothy Hart, an experienced real estate broker in the Del Mar area. Hart stated that he would not list the property in its present condition because of its defects. Further, he testified that although the normal marketing period for a residence in Del Mar is 4–6 months, this house would take substantially longer to sell even if repaired because of the stigma effect. Hart testified that all defects would need to be repaired, including cosmetic defects, and that the property could not be sold for a fair market price in its present condition.

Elaine Newkirk, an experienced salesperson in the Del Mar, California area, also testified that she would not list the property in its present condition. She indicated that in any sale of this property, Bessey would be required to fill out a Property Disclosure Form required of all sellers of California residential real estate.[1] She expressed concern over the effect of the disclosure of subsidence problems on the ultimate fair market value, even if the property were repaired.

Finally, Bessey himself testified that although the lot on which the house was constructed would be worth around $200,000 if it were buildable, because of the compaction necessary to make the lot buildable, the house and ground together are presently worth only $100,000. It was Bessey's opinion that he would be unable to sell the house other than for salvage value unless the repairs were made.

Dr. Todd seeks relief from the stay on the grounds that Bessey does not have equity in the residence and it is not necessary to an effective reorganization and that he has not been offered adequate protection for his interest in the property.

## ISSUES

I. Whether the Bessey property has equity and is necessary for an effective reorganization?

II. Whether Dr. Todd is entitled to adequate protection payments and, if so, when and in what amount?

## DISCUSSION

### I. WHETHER THE BESSEY PROPERTY HAS EQUITY AND IS NECESSARY FOR AN EFFECTIVE REORGANIZATION?

█ In order to be accorded the relief provided by § 362(d)(2), Dr. Todd must meet the two-prong test of that section, showing that the debtor does not have equity in the property and the property is not necessary to an effective reorganization.

The present value of the residence is difficult to precisely determine. Dr. Todd's appraiser testified that even if this residence were repaired, it would have a present fair market value of at least 15 percent less than the appraised fair market value because of the stigma effect of its subsidence problems. That would suggest a present fair market value of $320,000. However, deducting from that fair market value the *minimum* cost of the repairs which Carville testified are necessary, we have an indicated present fair market value

---

1. Cal.Civ.Code § 1134.5(a).

of $124,000 for the property ($320,000 − $196,000 = $124,000).

The house is encumbered by a note secured by a first deed of trust in favor of Home Savings on which $225,229 was owed as of the date of trial; the Todd note has an approximate $91,000 principal balance [2] and unpaid real property taxes of approximately $7,000. Bessey himself believes that the house and lot are not worth more than $100,000 in its present state. Therefore, by no stretch of the imagination does the debtor have a present equity in the residence. However, that is not the end of the inquiry.

The debtor claims that this property is necessary for his effective reorganization. Bessey testified that he purchased the house from Dr. Todd for roughly $358,000. In addition to the cash down payment of approximately $30,000, Bessey has paid off a $12,000 note secured by a third deed of trust on the property and made principal reductions on the Todd note totaling $15,000, for a total cash investment in the purchase of $57,000. Additionally, Bessey testified that he has expended around $25,000 in improving the property with carpets, drapes, landscaping and fixtures.

More important than the loss of Bessey's original investment which would result from a foreclosure would be the termination of the homeowner insurance benefits inuring to Bessey by reason of his continued ownership of the residence. His homeowner's insurer has agreed not only to pay for repairs to the residence, but also to give Bessey a living allowance for rental of an alternative residence while the repairs are being made. Bessey has been advised by the insurer that he will not be entitled to the policy benefits if he no longer owns the home.

The proposition that a debtor's primary residence may be necessary for an effective reorganization is not seriously in dispute. See *In re Bruce*, 40 B.R. 884, 888 (Bankr.W.D.Va.1984). Moreover, Bessey has testified that his plan of reorganization is to sell the residence once repaired, prosecute his tort claim against Dr. Todd for his loss and utilize the sale proceeds, together with the damage recovery on his tort claim, as the source of funds for his plan of reorganization. Where, as here, continued ownership of the residence is a predicate to realization of the economic benefits of an insurance policy which will, in turn, provide the debtor with the means to salvage an investment he might otherwise lose, there is even more reason to find that the residence is necessary for an effective reorganization.

Since Dr. Todd has failed to establish that the Bessey residence is not necessary to an effective reorganization, he does not meet the two-prong test of § 362(d)(2) and should be denied relief from the automatic stay on that basis.

## II. IS DR. TODD ENTITLED TO ADEQUATE PROTECTION AND, IF SO, WHEN AND IN WHAT AMOUNT?

■ As an alternate claim for relief, Dr. Todd asserts that he should be relieved from the stay because he is not adequately protected. The debtor contends his security interest in the residence is worthless and not entitled to adequate protection.

*In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir., 1984) held that an undersecured creditor is entitled to adequate protection of the value of its interest in the debtor's property. The court of appeals concluded that the secured creditor's right to take possession of and sell collateral upon the debtor's default, as well as reinvest the proceeds of sale, are rights for which the creditor has bargained. It is these rights—sometimes termed "lost opportunity costs"—which have a measurable value and must be adequately protected. *Supra*, at 435.

Nowhere does the Bankruptcy Code define the date of valuation for adequate

---

**2.** The court has excluded from the balance due on the Todd note claimed interest of $15,300. The debtor has raised a question of Todd's entitlement to any post-petition interest accrual and Todd's entitlement to post-petition interest would not alter the Court's ruling in this case.

protection purposes. As noted in the House Report discussion of the language of § 361:

> This section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principle. H.Rep. No. 595 at 339, 1978 U.S.Code Cong. and Ad.News at 5787, 6295.

The *American Mariner* decision cautioned the trial court against "over-compensating the secured creditor" by providing for adequate protection without taking into account the time and expense necessary to repossess and sell the collateral. *Supra,* at 435 n. 12. At least one court of appeals has determined that the bankruptcy court committed reversible error by determining that value, for purposes of adequate protection, was to be fixed as of the date the petition was filed. The Court reasoned that the financial benefit of the undersecured creditor's right to foreclose and reinvest liquidation proceeds does not arise until that time at which the collateral could be resold to a third party under state law. *In re Ahlers,* 794 F.2d 388, 397–98 (8th Cir., 1986). On the other hand, it would seem to strain any reasonable interpretation of *American Mariner* to require a debtor to adequately protect the interest of a secured creditor, where that interest is presently worthless. It is against this background which the Court must determine whether Dr. Todd has an interest which can be valued and adequately protected.

Based on the facts as discussed above, the Court finds that as of the date of the final hearing in this case, Dr. Todd did not have a present interest in the residence which required adequate protection. The

evidence presented by Dr. Todd's appraiser indicates that the house, even if repaired, would have a present fair market value of only $320,000. Assuming it takes $196,000 to repair the residence, for purposes of this adequate protection hearing only, the house, in its present state of disrepair, has a value of $124,000.[3] Since it is encumbered by a first deed of trust in favor of Home Savings in the amount of $210,000, as of the date of the hearing Dr. Todd did not have a secured claim requiring adequate protection.

However, as stated in *In re South Village, Inc.:* "If being undersecured is the predicate for opportunity cost, this predicate is inconstant." 25 B.R. 987, 996 (Bankr.D.Utah 1982). Despite Judge Mabey's conclusion in that case that, " ... the basis for opportunity cost, tied as it is to the method and outcome of valuation, maybe either incalculable or evanescent," (at 996), this Court believes she is mandated by *American Mariner* to attempt an estimate of Dr. Todd's lost opportunity cost based on that less than certain future.

While the Court might simply find that as of the date of trial, Dr. Todd was not entitled to adequate protection, such finding will only encourage a proliferation of later hearings on the same question. Under these facts, the value of the Bessey residence is inconstant and the answer to the question of whether Dr. Todd has an interest entitled to adequate protection will necessarily change depending upon when that question is asked. Therefore, in the interest of conserving judicial resources and in furtherance of the mandate of *American Mariner,* this Court will embark upon what is hoped to be the best possible analysis of the question given the information at hand and such reasonable projections as may be made from that information.

---

**3.** Although the deed of trust securing Dr. Todd's note provides that Dr. Todd must be named as a loss payee on the homeowner's insurance policy and may, at his option, apply any insurance proceeds to repayment of his note, the Court has purposely excluded Dr. Todd's claim to the benefit of those proceeds from her calculation of the value of the total collateral securing his claim. There is a substantial question whether Dr. Todd would be entitled to claim the benefits of an insurance policy where he is alleged to be one of the tortfeasors who created the problem. Ordinarily, the insurance company would be subrogated to Bessey's rights against Dr. Todd.

### A. *The Timing Of Adequate Protection Payments.*

Repairs to the residence are presently being made by persons employed by Bessey's insurance company. Until those repairs are completed and the defects in compaction remedied, Dr. Todd does not have an interest requiring adequate protection. His right to foreclose at this time would give him no financial benefit, since the house cannot be resold until it is repaired. Carville's proposal (which has been accepted by Bessey's insurance company) indicates that all required work described would be completed within 26 weeks (weather permitting) following written authorization of the homeowner and issuance of a building permit. It is only upon Carville's certification that the required repairs have been completed that Dr. Todd's interest in moving forward to foreclosure has some protectable value.

Dr. Todd filed a notice of default on April 29, 1985. The three-month notice period provided by California law expired pre-petition. A notice of trustee's sale was posted on August 15, 1985, and a trustee's sale was scheduled to be held on the date the debtor filed his Chapter 11 petition. In the absence of any evidence that the trustee's sale has been continued from time to time throughout the debtor's Chapter 11 proceeding, the Court will assume that in order to proceed with his foreclosure sale, Dr. Todd would have to re-record his notice of trustee's sale, allowing a minimum 20–day period before he could complete that foreclosure. Cal.Civ.Code § 2924f. Therefore, to the approximate 26–week period to repair the residence, the Court must add 20 days—say, three weeks—to the time which Dr. Todd could reasonably expect to have regained possession by foreclosure, and have a saleable asset.[4]

However, *Ahlers* and *American Mariner* teach us that the creditor's right to adequate protection of his reinvestment return does not begin until the creditor would be entitled to take possession of the collateral (as permitted by state law), sell the residence and reinvest the proceeds. See *Ahlers, supra,* at 396; *American Mariner, supra,* at 435. See, also, *In re South Village, Inc., supra,* at 996. Therefore, to the amount of time necessary to foreclose on the residence, the Court must add the anticipated length of time which Dr. Todd could reasonably be expected to hold the residence for resale.

The only testimony concerning marketing time for a residence in Del Mar was that of Timothy Hart, who testified that the normal amount of time necessary to sell a residence in this area is four to six months. He also testified that sale of this residence would take substantially longer because of the stigma of the subsidence problems. Although no specific time estimate was ascribed to a "substantially longer" time period, the Court believes that it is reasonable to assume that a substantial increase over the normal marketing time is one which is at least fifty (50%) percent longer than the norm. That assumption increases the marketing time for this residence to a range of six to nine months. As a mid-point in that range, the Court will assume a 7.5 month or a 30–week marketing period will be necessary to sell this residence. Therefore, adequate protection payments should not begin until 33 weeks after Carville's certification that the required repairs have been completed.

### B. *The Value Of The Interest To Be Adequately Protected.*

Despite the fact that the Court is fixing a value for adequate protection purposes some 59 weeks in advance, (26 weeks for

---

**4.** The Court assumes that at any foreclosure sale, Dr. Todd would be the purchaser. As will be developed, the fair market value of the residence at the time of the foreclosure sale will be $320,000. Adding just the present amount owed the holder of the first trust deed of $225,000 and real estate taxes of $7,000 to Dr. Todd's note balance of $106,300 [including his interest claim here since he asserts it and § 506(b) would not control his entitlement in a foreclosure setting], the minimum owed on the residence at time of foreclosure would be $331,300. It is unlikely a third party bidder would bid enough to make Dr. Todd whole.

repair +33 weeks for foreclosure and re-sale = 59 weeks), the fixing of value is not as conjectural as it may appear. Dr. Todd's appraiser and Bessey's real estate broker and salesperson all testified that there has not been much appreciation in the value of residential real property in Del Mar, California, during the last four years. None of the witnesses testified about the existence of any current market conditions which would alter that market condition in the near term future. Therefore, it is reasonable for the Court to assume that 33 weeks after Carville certifies the required repairs have been completed, Dr. Todd will have completed foreclosure and resold the Bessey residence for the $320,000 fair market value, as testified by his appraiser.

However, to protect both parties from an inequitable result caused by this Court's exercise in prescience, either party may ask the Court to reconsider her determination of value because of substantially changed market conditions at any time after Carville certifies repairs have been completed and before adequate protection payments should begin. The scope of hearing on any motion to reconsider will be limited to changes in market conditions which have affected the value of the residence (as contrasted with a re-trial of the question of the appraised value of the residence).

To arrive at a value of Dr. Todd's "lost opportunity cost" at that time, the Court must also deduct costs of sale. See *American Mariner, supra*, at 435, n. 12; *Ahlers, supra*, at 396. Hart testified that sale expenses, including commissions and closing costs, average eight (8%) percent of gross sales price for residential property. Therefore, from the $320,000 gross sales price, the Court must deduct eight (8%) percent of the sales price, or $25,600, to arrive at the net selling price Dr. Todd can reasonably be expected to realize upon sale of the residence.[5]

Finally, Dr. Todd's net realization must be further reduced by the amount owed to the first trust deed holder and the accrued real property taxes. Estimating those amounts at this time is not possible; however, they can be readily determined by declarations submitted by the parties 33 weeks after Carville certifies repairs have been completed.

### C. *The Amount Of The Adequate Protection Payments.*

Compensation for Dr. Todd's delay in enforcing his rights to reinvest proceeds of sale may be made by requiring the debtor to pay monthly interest payments on the value of the collateral upon liquidation.[6] See *American Mariner, supra*, at 435; *In re Briggs Transportation Co.*, 780 F.2d 1339, 1350 (8th Cir.1985); *Ahlers, supra*, at 396 herein. Although an undersecured creditor may sometimes urge compensatory payments at the market interest rate on the liquidation value of collateral, Dr. Todd has asked for the contract rate. Bessey has introduced no evidence and makes no contention that application of the contract rate in this instance would be inequitable. Accordingly, upon commencement of adequate protection payments (33 weeks after Carville certifies that repairs to the residence have been completed), Bessey shall make monthly payments to Dr. Todd in an amount equal to ten (10%) percent interest on that sum which is calculated to be the value of Dr. Todd's secured interest after making the adjustments to and deductions from fair market value set forth in Paragraph B above.

This Memorandum Decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Counsel for Bessey shall prepare an order in accordance with this Memorandum within ten (10) days from the date of entry hereof.

5. Of course, the dollar amount of the eight (8%) percent sale expenses will change in the event either party makes a motion to reconsider the fixing of fair market value which is granted.

6. Indeed, Dr. Todd has asked for no other form of adequate protection other than monthly payments.