**In re Jackob WANDLER and Carrie Dorothy Wandler, d/b/a Wandler Quarter Horse and Jack's Family Restaurant, Debtors.**

**Bankruptcy No. 84–05144.**

United States Bankruptcy Court,
D. North Dakota.

Aug. 4, 1987.

See also, Bkrtcy., 77 B.R. 735.

Ross Espeseth, Bismarck, N.D., for debtors.

James Geyer, Dickinson, N.D., for Liberty Nat. Bank.

Sean Smith, Bismarck, N.D., for CMAC.

Charles Johnson, William Westphal, Bismarck, N.D., for Western Sav. Credit Union.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is confirmation of the Chapter 11 plan of Jackob and Carrie Wandler (Debtors). The Debtors filed for Chapter 11 relief March 19, 1984. The First Modification Of Debtors' Plan Of Reorganization presently before the court was filed April 22, 1987. All creditors have agreed to accept the plan except Liberty National Bank of Dickinson (Liberty National), the Class 4 claimholder who also may be a Class 9 unsecured claimholder. On May 22, 1987, the Debtors moved for confirmation pursuant to section 1129(b) of the Bankruptcy Code. Liberty National Bank has raised a litany of objections to the plan. Liberty National has also made a section 1111(b) election which the Debtors have moved to set aside alleging that the bank's interest in the secured collateral is of inconsequental value. A hearing on the plan was held before the undersigned on June 11, 1987. The facts as material are as follows:

### Findings of Fact

The Debtors are principally involved in the operation of a family owned business, Jack's Family Restaurant, which they have operated since 1971. The Debtors have also previously been extensively involved in

a quarter horse enterprise and to a lesser extent, in real estate. The Debtors personally have a number of income producing land holdings.

The Debtors operate a well managed family restaurant and also do a substantial amount of catering and custom barbecuing out of their restaurant. The restaurant business declined in 1984, due in part to the Debtors' filing bankruptcy. Gross operating profits for 1984 were $20,459.00. In 1985, the business began to rebound with a gross operating profit of $43,334.00 and, in 1986, the gross operating profit was $52,490.00. Jack Wandler is certain that the 1987 projected operating profit of $50,400.00 will be met, and probably exceeded, as business is up over 1986. While four to five restaurants have recently been closed in the distressed Dickinson community, the Debtors' restaurant business appears to be growing each year.

The Debtors' restaurant is open Tuesdays through Sundays. Both Debtors put in approximately 15 hours per day at the restaurant as chief cook, repairman, and managers. They also work at the restaurant on Mondays as well to prepare for the upcoming week, and to handle various catering orders. The Debtors' sons also help out, as needed, but are not regular employees. They are paid between $3.35 to $4.00 per hour. The Debtors pay their cooks $4.00 per hour. Jack Wandler testified that the value of services to the restaurant by he and his wife is approximately $20,000.00 per year each. At this rate, the Debtors are receiving approximately $4.00 per hour for their services, which the court believes is a very conservative figure. The Debtors have no set salary draw. They eat at the restaurant to capitalize on the waste factor, and estimate the draws for personal expenses are approximately $100.00 per month. Many of their personal expenses including Blue Cross-Blue Shield health insurance and vehicle expenses which are mostly related to the restaurant business, are paid out of the restaurant account. The evidence is unclear whether the $75.00 per month personal electric bill is paid by the Debtors out of the $100.00 draw or the business. The court presumes this is paid out of the business. Based upon the testimony at trial, it appears that the Debtors' restaurant business is virtually their life, that minimal personal expenses are incurred and that most of these expenses are paid by the business.

The Debtors project total restaurant sales of $215,000. The projected restaurant expenses are broken into the following categories:

| | |
|---|---|
| Food Costs | $85,000.00 |
| Labor | $42,000.00 |
| Tax on Labor | $ 3,500.00 |
| Sales Tax | $ 9,000.00 |
| Utilities | $18,000.00 |
| Insurance | $ 2,100.00 |
| Miscellaneous | $ 5,000.00 |

Total cost of restaurant operations $164,600.00. The Debtors rent a barbecue unit from their son for $150.00 per month which the court calculates to be $1,800.00 per year. This payment, it appears, must come out of the miscellaneous account, thus, leaving $3,200.00 in that account. IRS taxes will also come out of that account, although there is little evidence as to what IRS taxes will eventually be.

IRS filed an amended proof of claim on April 19, 1987, in the amount of $190,583.83, which includes estimated taxes for 1980 thru 1982 in the amount of $185,924.32 and assessed taxes for 1983 and 1984 in the amount of $4,492.98. On April 9, 1987, IRS also filed a request for payment of administrative expenses for estimated taxes in the amount of $82,778.53. In view of the Debtors' historical income, the estimated taxes initially strike the court as being extremely high. Nevertheless, it is apparent that the Debtors do have some very serious tax problems which must be addressed. The Debtors have not filed their tax returns for approximately five years. They presently have an accountant working on their returns, and as of the date of this hearing, their returns were ready to be sent in. According to Jack Wandler, the Debtors' accountant feels that the Debtors will be in "pretty good shape" on taxes, although no dollar figure was available. The Debtors' ac-

countant apparently feels that the IRS is out of line on its estimates. Jack Wandler testified that he feels they should be able to take care of the taxes without any major problem, as the restaurant is "about even", depreciation still remains in the barn, and the contract for deeds do not create a problem. The Debtors feel that the restaurants' miscellaneous expense account will be sufficient to cover IRS taxes.

The Debtors project income available for plan payments to be as follows for 1987:

| | |
|---|---|
| Restaurant (gross operating profit) | $50,400.00 |
| Aasedchuk payments | $13,585.00 |
| Messer payments | $ 5,998.00 |
| Farm Rental income | $10,000.00 |
| Total Income | $79,983.00 |

The Debtors' Class 1 creditor, Abbie Fiel, who is owed approximately $30,000.00 on a contract for deed for the purchase of the restaurant building valued at $72,000.00, will be paid $477.88 per month. Fiel is willing to defer some default payments to the end of the contract and cooperate with the Debtors.

The Debtors' Class 2 creditor, First National Bank, was owed approximately $72,-774.43 on the date of filing. This debt is secured by a mortgage on the restaurant with equity of approximately $42,000.00, and by a security interest in the personal property of the restaurant valued at approximately $10,000.00. The First National claim will be paid in full at 14% interest, with monthly payments of $1,050.00.

Western Savings Credit Union (Western Savings) has a claim of approximately $260,000.00, secured by various parcels of real estate. The value of the real estate is $235,000.00, which will be paid over 20 years at 12% with annual payments of $31,-461.50. The remaining $25,000.00 will be treated as an unsecured claim. The Debtors also propose to abandon to Western Savings any interest in Lots 1 and 2 of Block 1, and the West half of Lots 1 and 2, in Block 2, so that Western Savings and Liberty National can resolve their dispute in determining who has a superior interest to that property.

As of the date of filing, Liberty National, a Class 4 creditor, was owed $394,155.15. This debt was secured by horses, household goods, machinery, equipment and real estate mortgages on Lot 3 of Block 1, valued at $2,100.00, and Lots 1 and 2 of Block 1 and the West one half of Lots 1 and 2 in Block 2, along with a second mortgage on the Debtors' home to which Liberty National has already been granted relief from stay. All the mortgaged real estate will be abandoned to Liberty National Bank by the Debtors.

The Debtors' interest in horses secured to the bank is valued at approximately $1,000.00. These horses will be sold with the proceeds being turned over to the bank on or before the effective date of the plan. The court interprets this to include the Debtors' interest in proceeds of colts recently sold as well. Liberty National also has a security interest in some old machinery of the Debtors, valued at approximately $7,000.00 in 1979. The present value of the machinery appears to be quite minimal. The Debtors have moved to avoid liens on the machinery, as well as the lien on the personal household goods, pursuant to section 522(f) of the Bankruptcy Code. The lien avoidance action is under advisement although the bank concedes that the lien on household goods is avoidable, and if the machinery lien is not avoided, the Debtors have indicated a willingness to sell the machinery and turn the proceeds over to Liberty National.

Liberty National also believes that it has a security interest in box stalls which the Debtors believe are fixtures and part of the real estate mortgaged to the Credit Union. The Value of the box stalls are approximately $15,000.00. They are attached by brackets to the barn in which they are located, and are apparently very heavy, taking at least four men to transport them.

The Debtors propose to pay all unsecured creditors, including the unsecured claim of Liberty National, 5% of their claim over ten years, or one half of one percent per year. Based upon the Debtors' liquidation schedules, unsecured creditors would receive nothing in liquidation, al-

though the Debtors' one-third interest in R.D.J. partnership, said interest valued at $5,667, is not included in the liquidation analysis.

The Debtors will also have administrative expense attorney fees in the approximate amount of $10,000.00. The Debtors' attorney has agreed to make arrangements with the Debtors to have these fees paid over time if necessary. Priority claims of state and federal tax agencies in the minimal amount of $8,000.00 and perhaps much more, are also outstanding, and will be paid with interest over six years. In addition, the Debtors owe approximately $4,650.00 of pre-petition real estate taxes which will be paid within six years of their assessment. Treatment of post-petition IRS and real estate taxes is not provided for or defined under the plan.

The Debtors have apparently not accumulated any cash reserve during the pendency of this bankruptcy, as only two or three payments on the Fiel contract have been made thus far this year. The Debtors are renting their homestead barn facilities and pasture to their son for $10,000.00 per year, although the son has only paid approximately a total of $15,000.00 during the course of this bankruptcy. The Debtors' plan provides for payment of the Fiel contract on a monthly basis, and provides for annual payments to Western Savings Credit Union in the amount of $31,461.50 per year, which have not been made since 1985. In addition, the Debtors have to begin making tax payments, which have also not been made during the interim period. These figures suggest that in view of the Debtors inability to generate excess cash in the past, and the additional payments to be made in the future, that payments will not be able to be met under the plan. However, the Debtors believe that their son will be making the annual $10,000.00 rental payments to them. In addition, the Aasedchuk payment of $13,585.00 was missed in 1986, although the Debtors believe that he has the money and that the 1987 payment will be made. If the Debtors had received this additional rental income, between $20,000 to $25,000 of extra cash flow would have been generated during the past year.

### Conclusions of Law

■ Liberty National has elected to make a section 1111(b) election and have its claim treated as fully secured, thus waiving any right to an unsecured claim. Upon making an 1111(b) election, a creditor such as Liberty National generally has the right to receive the full amount of its allowed claim over time, as long as these payments have a present value as of the effective date of the plan, of at least the value of the creditor's interest in its collateral. *In re Webster*, 66 B.R. 46, 47 (Bankr.D.N.D. 1986); 5 Collier on Bankruptcy ¶ 1111.02[5] (15th ed. 1985). However, a creditor may not make an 1111(b) election if:

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of [Title 11] or is to be sold under the plan.

11 U.S.C. § 1111(b)(1)(B).

"Section 1111(b) was designed to overrule *In re Pine Gate Associates*, 2 B.C.D. 1478 (N.D.Ga.1976)". *In re South Village, Inc.*, 25 B.R. 987, 999 (Bankr.D.Utah 1982). In *Pine Gate*, an undersecured mortgagee of an apartment unit was cashed out during depressed markets for the value of its collateral, and could not sue for the deficiency or retain an interest in the property and hope for an upswing in the market. *See, e.g.*, Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements In Judicial Machinery of the Senate Comm. on the Judiciary, 95th Cong., 1st Sess. 704, 720–721, and 855 (1977). The real value of a section 1111(b) election is where the collateral appreciates in value and the debtor defaults under the plan. *In re Southern Missouri Towing Service, Inc.*, 35 B.R. 313, 314 (Bankr.W.D.Mo. 1983). Then instead of having a secured claim based upon the value of the collateral at confirmation, with the remaining debt having received unsecured treatment

and/or discharged, the creditor may foreclose on the collateral and recover up to the full amount of its claim.

Section 1111(b) is not meant to be a barrier to reorganizations, but is meant to be a protection against creditors from being cashed out in a depressed market. If secured collateral is to be sold, and creditors believe that the collateral will appreciate, the secured creditor may buy the collateral to protect its interest. *See* 11 U.S.C. § 1111(b)(1)(B)(ii). In the case at bar, the Debtors propose to sell their interest in the horses secured to Liberty National, and in the machinery, if the lien is not avoidable, and to give Liberty National the proceeds of both. This treatment complies with section 1111(b)(1)(B)(ii). The Debtors also propose to turn over real estate mortgaged to Liberty National. While not specifically allowed under section 1111(b), the effect of this treatment is the same as a sale as Liberty's claim will be reduced by the fair market value of its interest in the collateral. If the Debtors are unsuccessful in avoiding Liberty National's alleged security interest in the box stalls, the court does not know if the Debtors propose to retain the box stalls and pay Liberty the value of the security over time, sell the box stalls, or abandon them. A sale or abandonment is entirely consistent with section 1111(b).

However, even if the box stalls were retained, the $15,000.00 value plus the minimal value of the machinery if Liberty National succeeds in the lien avoidance action, is inconsequential in relation to the Bank's $390,000.00 claim, being approximately 4% of the total claim. This court is only aware of one other court which has addressed the inconsequential value provision of section 1111(b). The court in *In re Baxley*, 72 B.R. 195, 198 (Bankr.D.S.C.1986), held that inconsequential value means no value. This court does not agree. The Debtors, within a reasonable life of a plan, could not make payments to Liberty National totaling approximately $390,000.00 with a present value of $15,000.00. Payment in consequence of such a proportionally small value of collateral could simply not be amortized in such a manner. If larger payments were made other unsecured creditors would be discriminated against in consequence of Liberty's windfall, as Liberty would be receiving more than the present value of its claim. This court believes that when a claim cannot be paid in full, either amortized annually or in a lump sum payment at the end of a specified period of time (i.e. thirty to forty years), without exceeding the present value of the collateral, the creditor's claim is probably of inconsequential value and an 1111(b) election should not be allowed. This is particularly true in a case such as the case at bar, when the court is dealing with depreciable personal property which will certainly not appreciate in value to any substantial degree in the future. If the inconsequential value language of section 1111(b) was meant to mean no value, then Congress would have so stated under the language of that section. To interpret inconsequential value differently would be to discriminate against other unsecured creditors, which is clearly not allowed under section 1129 of the Bankruptcy Code.

A plan under Chapter 11 cannot be confirmed unless all of the applicable requirements of section 1129 of the Bankruptcy Code have been met. The burden of proof is on the debtor to establish that the section 1129 requirements are complied with, and that the plan is capable of confirmation.

Section 1129(a)(9) provides that administrative expenses must be paid on the effective date of the plan, unless the administrative expense claimants agree otherwise or various exceptions apply. The Debtors' plan provides for payment of various administrative expense claims, although the court at this time is not convinced that all administrative expenses, namely real estate taxes incurred during the bankruptcy and IRS taxes incurred during the bankruptcy, have been provided for. Something more than the Debtors' suggestion that it does not appear that taxes will be a problem is necessary to rebut a claim for administrative expenses by IRS in excess of $80,000.00. In addition, something more than the Debtors' comment that taxes will not appear to be a problem is necessary to rebut a proof of

claim by IRS for pre-petition taxes in the amount of $190,583.83.

■ An additional concern of the court is the section 1129(a)(11) requirement that confirmation of the plan is not likely to be followed by the liquidation or the need for further reorganization by the debtor, namely that the plan be feasible. The Debtors' own projections provide for an approximate cash excess in a given year in the amount of $163.00 under the plan. Obviously, if the Debtors' miscellaneous expense account for the restaurant is not sufficient to handle IRS taxes, the plan on its face is not feasible. In view of the large amount of IRS taxes claimed, the court does not believe that it at this time can determine that the plan is feasible. Even if the IRS claims, and administrative expenses, prove to be minimal, the success of the plan is certainly not guaranteed. The Debtors' projected personal withdrawal expenses are minimal to the extent of almost being unreasonable. However, the court must assume that many of their personal expenses are being paid directly by the restaurant business. In view of the Debtors' apparently conservative estimate for gross operating income from the restaurant, and the Debtors' belief that this amount will be exceeded, the potential for some excess income to cover other expenses does exist. As the Eighth Circuit said in *Ahlers,* a plan should be approved if it appears reasonably probable that debt can be paid with interest over a reasonable period of time. *See In re Ahlers,* 794 F.2d 388, 392 (8th Cir.1986). However, these projections must be based on objective facts, and things which are to be done after confirmation must be capable of being done as a practical matter. *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985). If the Debtors can establish to the court with some reasonable accuracy and reliability, such as affidavits by their accountant, that the IRS tax problem is capable of being satisfactorily handled under the plan, and if the Debtors can submit to the court further explanation of the post-petition real estate tax situation and treatment thereof under the plan the court will be inclined to find that the plan is feasible. However,

this determination cannot be made based upon the record as it presently exists.

■ Liberty National also believes that the absolute priority rule of section 1129(b)(2)(B)(ii) is not being complied with. Under the absolute priority rule, a dissenting class of unsecured creditors must be provided for in full before any junior class, such as the Debtors, may receive or retain any property under the plan, unless the debtor contributes something reasonably compensatory and measurable to the reorganization efforts. *In re Ahlers,* 794 F.2d 388, 403 (8th Cir.1986). In order to determine whether the absolute priority rule has been met, the court must resolve the question of "whether the [debtor's] new contribution is reasonably equivalent to the equitable ownership interest the [debtor] would retain under the plan." *In re Ahlers,* 794 F.2d at 404. Based upon the evidence as presented, the court is convinced that the value of the Debtors' contributions of labor and management less withdrawals for living expenses, will equal or exceed the value of the retained ownership interest in the Debtors' business upon maturity of the Chapter 11 plan. Thus, the absolute priority rule in this instance is being complied with.

■ Section 1129(b)(1) of the Bankruptcy Code provides that confirmation of a plan under that section will not occur if the plan discriminates unfairly. In the instant case, First National Bank has security valued at approximately $52,000.00, with debt valued at $72,774.43. However, the Debtors propose to pay this claim in full at 14% with monthly payments of $1,050.00. Inasmuch as First National Bank appears to be undersecured in the amount of approximately $20,000.00, the $20,000.00 should be treated as an unsecured claim and receive the same treatment as other unsecured claims under the plan. It appears that this is not being done.

Accordingly, and for the reasons stated herein, the First Modification Of Debtors' Plan Of Reorganization as presently filed is

not capable of confirmation and confirmation is DENIED.

IT IS SO ORDERED.